**Gil Q. ALVAREZ, Plaintiff,**

v.

**The CITY OF NEW YORK and The Police Department Of the City Of New York, Defendants.**

**No. 98 CIV. 7227(DC).**

United States District Court, S.D. New York.

Dec. 11, 1998.

Goodstein & West by Robert David Goodstein, Lisa R. Lipman, New Rochelle, NY, for Plaintiff.

Michael Hess, Corporation Counsel for the City of New York by Steven K. Weiss, Naomi Sheiner, Assistant Corporation Counsels, New York City, for Defendants.

Arthur N. Eisenberg, New York Civil Liberties Union Foundation, New York City, as Amicus Curiae.

## OPINION

CHIN, District Judge.

In this case, the third of three employment cases that plaintiff Gil Q. Alvarez has brought against the Police Department of the City of New York (the "NYPD"), Alvarez alleges that the NYPD retaliated against him for filing the second of the three cases, *Alvarez II*. At that time, Alvarez moved for a preliminary injunction to prevent the NYPD from conducting an investigation into his alleged misuse of confidential information in the first case, *Alvarez I*. I denied the motion, declining to interfere with the NYPD's internal disciplinary process because Alvarez had failed to establish either the threat of irreparable harm or the likelihood of success on the merits. *Alvarez v. City of New York*, 2 F.Supp.2d 509, 514–15 (S.D.N.Y.1998).

The NYPD thereafter proceeded with an investigation. Instead of merely exploring Alvarez's alleged misuse of confidential information, however, it conducted a much broader investigation. It interrogated Alvarez about the allegations in his complaint and amended complaint in *Alvarez II*, and eventually it served Alvarez with Charges and Specifications accusing him of violating NYPD regulations. Eleven of the fifteen charges alleged that Alvarez made "false official statements" in his complaint and amended complaint in *Alvarez II*. Ten of those eleven alleged that the false statements were made in an "Official Department Interview" as well.

Alvarez moves for a preliminary injunction to enjoin the NYPD from pursuing disciplinary proceedings against him based on his filing of *Alvarez II*. Because Alvarez has demonstrated both irreparable harm and a likelihood of success on the merits, the motion is granted. The NYPD is hereby enjoined, during the pendency of this action, from prosecuting any disciplinary proceedings against Alvarez based on his filing of *Alvarez II*.

Pursuant to Fed.R.Civ.P. 65, my findings of fact and conclusions of law follow.

## FINDINGS OF FACT

### A. Alvarez I

In October 1996, Alvarez filed *Alvarez I*, a Title VII action in which he alleged that the NYPD discriminated and retaliated against him because he had refused to negatively evaluate minority officers who had complained about discriminatory treatment and the use of racial slurs by police officers.

During the course of discovery, the NYPD accused Alvarez of improperly obtaining confidential NYPD records for use in his lawsuit. At some point, Alvarez's then-attorney invited the NYPD to investigate the matter, so that Alvarez would have an opportunity to clear his name. On October 1, 1997, the Internal Affairs Division ("Internal Affairs") of the NYPD opened an investigation into Alvarez's alleged misuse of confidential NYPD information.

Alvarez was thereafter transferred to the Civilian Complaint Review Board ("CCRB") Team where, in his capacity as Assistant Department Advocate, he investigated and prosecuted cases involving allegations of police brutality and misconduct.

The parties settled *Alvarez I* in February 1998. The City paid Alvarez $62,500, but the NYPD refused to agree to any equitable relief. Alvarez accepted the settlement nonetheless. As part of the settlement, he signed a general release.

On or about March 23, 1998, Internal Affairs orally directed Alvarez to appear for a disciplinary interview in connection with his alleged improper use of confidential documents. The interview was to be conducted under oath, as part of as a "PG 118–9 hearing." [1] Initially scheduled for March 27, 1998, the interview was postponed until April 8, 1998.

### B. Alvarez II

On April 7, 1998, the day before the scheduled interview, Alvarez filed *Alvarez II* and

---

1. This phrase refers to the governing provision in the NYPD Patrol Guide.

sought a temporary restraining order and preliminary injunction enjoining the NYPD from proceeding with the PG 118–9 hearing and otherwise prosecuting the disciplinary proceedings.

Alvarez alleged that the NYPD retaliated against him for filing *Alvarez I* and for refusing to cover up police misconduct. In particular, Alvarez alleged that he had been ordered by his superiors to cover up a case before the CCRB in which two NYPD detectives, Larry Schwartz and Dwayne Shepherd, were accused of unlawfully detaining and beating an Hispanic man, Manuel Villa, and fabricating charges against him. Alvarez contended that he had been ordered not to call the complainant or the medical examiner as witnesses at the departmental trial. He alleged further that he had been demoted from his position as "Training Sergeant" and otherwise adversely treated in retaliation for his actions.

Alvarez's allegations of retaliation and the cover-up of police brutality received extensive and sympathetic press coverage. *See, e.g.,* Al Guart, *Whistle-Blowing Cop in Hiding,* N.Y. Post, April 10, 1998, at 20 (reporting that Alvarez had gone into hiding from police investigators after going public with claims that NYPD "supervisors routinely order[ed] underlings to reduce charges against cops accused of brutality"); Patricia Hurtado, *Cop Fears Revenge,* Newsday, April 10, 1998, at A29 (reporting that Alvarez "fear[ed]" retaliation by the NYPD for revealing that he was "ordered by superiors" to cover up an alleged incident involving excessive use of force); David Kocieniewski, *A Police Prosecutor Asserts a Cover-Up in a Beating Inquiry,* N.Y. Times, April 9, 1998, at A1 (reporting that Alvarez had charged in a federal lawsuit that his commanders had ordered him to "cover up" evidence of police brutality and that he had been "demoted" because he had objected to the NYPD's handling of the allegations); *NY Cop Alleges Cover-Up in Inquiry,* AP Online, April 9, 1998 (reporting that Alvarez had charged in a federal lawsuit that his commanders had

urged him to conceal evidence in investigation of a beating by two detectives and that he had been "demoted" for criticizing the NYPD's handling of the case).

I heard argument on Alvarez's motion for a temporary restraining order and preliminary injunction on April 7 and 14, 1998. The NYPD agreed to voluntarily postpone Alvarez's PG 118–9 interview until after a decision on the motion. On April 21, 1998, I denied the motion. *Alvarez v. City of New York,* 2 F.Supp.2d 509, 514–16 (S.D.N.Y. 1998). As a consequence, the NYPD was free to proceed with its investigation.

### C. *The Investigation*

#### 1. *The April 28th Interview*

Alvarez's PG 118–9 hearing was held on April 28, 1998. Three members of the NYPD questioned Alvarez: Captain James Waters, the commanding officer of the Special Investigations Unit (the "SIU") of Internal Affairs; Detective Dennis Barden, of SIU; and Sergeant Michael Daley, of the Special Prosecutor's Office. Alvarez was represented by his attorney from *Alvarez II,* Bonita E. Zelman.

The transcripts of the April 28th hearing [2] show that Alvarez was advised that he was present to be questioned as a "subject" of an official Police Department investigation into allegations that he "improperly accessed confidential information from [NYPD] computers for the furtherance of [his] law suit." (CX A at 3–4). Alvarez was advised at the outset of the interview that if he refused to testify or to answer questions relating to the "performance of [his] official duties, [he would] be subject to department charges [that] could result in [his] dismissal from the Police Department." (*Id.* at 4).

The hearing transcripts show that Alvarez's attorney and the three NYPD officials engaged in numerous heated colloquies as Zelman objected repeatedly to questions. At one point, Zelman directed Alvarez not to answer a question unless the examiners pro-

---

2. The two transcripts (one for each of two tapes) were submitted to the Court by the Corporation Counsel's Office on December 1, 1998, the day after the preliminary injunction hearing. The first tape has been marked CX (for "Court Exhibit") A and the second CX B.

vided certain clarifying information first. Daley responded:

> Counselor, if that's the legal course that you wanna take, you're certainly entitled to advise your client accordingly. However, as you well know, if he refuses to answer questions, he will be suspended and the Department will take procedures—we'll, *we'll embark on procedures designed to terminate him from the Police Department.* So why don't we begin answering questions and handle this on a question by question basis?

(CX A at 19) (emphasis added). After Zelman asked if Alvarez was being directed to answer the questions, Waters responded: "I am Captain Waters, and I am going to direct him to answer the questions . . . ." (*Id.* at 20).

At times, the questioning took a hostile and sarcastic tone. For example:

> Q Did you ever have any conversations with anybody from the Corporation Coun[sel] regarding your lawsuit? Did you speak to the people from the Corporation Coun[sel]?
>
> A My attorney. Regarding my lawsuit?
>
> Q Yes.
>
> A My attorney spoke to them.
>
> Q Did you ever speak to them?
>
> A I don't believe I did.
>
> Q You don't believe that you ever uttered a single word to any of the people from the Corporation Coun[sel]?
>
> A No.
>
> Q So, you didn't say hello to them, you didn't introduce yourself? You didn't greet them?
>
> A I may have exchanged pleasantries, if that's what you're asking . . . (interrupted) . . .
>
> Q So, you did talk to them, you did open your mouth and communicate . . . .

(CX A at 102–03).

At some point, Alvarez was asked repeatedly about his request for an injunction in *Alvarez II* and whether he sought the injunction because he knew that he was go-

ing to be questioned at the PG 118–9 hearing about how he obtained confidential information. (CX B at 13–33). The NYPD officials then attempted to ask him about the Court's decision on his motion for a preliminary injunction. (*Id.* at 33–34, 38). Zelman objected emphatically to the questions about *Alvarez II* and the hearing ended abruptly. (*Id.* at 35–40).

### 2. *The Investigation Broadens*

After the newspaper articles appeared about Alvarez's allegations of a cover-up and retaliation, the SIU opened an investigation into the allegations. (*See* 11/30/98 Tr. at 121–22). Alvarez was, in essence, the "complainant" and the subjects of the investigation purportedly were Assistant Commissioner Kevin Lubin, then-Captain Patrick Bradley, and Sergeant David Suarez. (*Id.* at 120, 122–24).

The SIU conducted PG 118–9 interviews of Lubin (PX 17), Bradley (PX 16), and Suarez (PX 15), as subjects, on May 5, 1998. The tone of the questioning during these interviews was drastically different from the tone of the questioning of Alvarez, which was often hostile and in the nature of cross-examination. In contrast, the questioning of Suarez, Bradley, and Lubin was much more respectful and much less inquisitorial in nature. For example, even though Suarez, Bradley, and Lubin were "subjects," they were asked few leading questions and instead were given the opportunity to give long, explanatory, narrative answers.

Suarez, Bradley, and Lubin denied Alvarez's allegations concerning the Shepherd and Schwartz case as well as his allegations of retaliation. They denied that Alvarez had been a Training Sergeant or that he had been deprived of a promotion to Group Leader for retaliatory reasons. All three spoke highly of Alvarez, and they stated that if there had been a desire to cover-up the case, Alvarez would not have been assigned to the case, for Alvarez was one of the better, more aggressive prosecutors in the Department Advocate's Office. (*See, e.g.,* PX 15 at 40).[3]

---

**3.** Suarez stated: "[W]e always view[ed] Gil as a very experienced attorney and an attorney [who]

could help people learn how to do trials." (PX 15 at 7). Bradley stated: "Gil had been in the

Lubin, Bradley, and Suarez gave detailed responses to questions about the Shepherd and Schwartz case. Lubin explained that at one point the guilty pleas almost fell through because he was unhappy with what he believed to be equivocation in Shepherd's admission of guilt and he insisted that there would be a full trial unless Shepherd "absolutely admitted on the stand that he had repeatedly struck the complainant, Manuel Villa, after he had been subdued and handcuffed." (PX 17 at 19). He further stated that it was Alvarez who offered to talk to Shepherd's attorney to "salvage" the guilty pleas. He said: "[S]o if there's any suggestion ... that somehow Gil was forced into this thing, as far as I'm concerned, that is not the case at all, that is not the case at all. Gil at the very end wanted to salvage this thing. I was prepared to go ahead with the full-blown trial." (*Id.* at 20; *see also* PX 16 at 12–13).

In explaining their willingness to agree to the guilty pleas and sentences of the loss of 20 days vacation days, Suarez, Bradley, and Lubin pointed to the following factors: the prosecuting attorney who had the case prior to Alvarez had recommended that the case be dismissed because the complainant was not credible (PX 17 at 12–13; PX 16 at 11, 12); the complainant had made inconsistent statements (PX 15 at 27); the complainant was unable to identify Shepherd (PX 17 at 13; PX 15 at 28–29); the case was "resurrected" after Alvarez took over and developed the case (PX 17 at 13; PX 16 at 11–12); Schwartz was looking to retire (PX 17 at 14); Schwartz and Shepherd did admit to their guilt (PX 16 at 19); Schwartz "had about 25 years on the job, [with] a fairly clean record," and Shepherd had "a fairly clean record as well" (PX 16 at 19); the extent of Villa's injuries, including the absence of "any kind of serious physical injury" (PX 16 at 16); Villa had indicated that other "unidentified individuals either punched [or] kicked him

while he was being handcuffed and/or after he was placed in the cell" and thus an issue existed as to whether all Villa's injuries were inflicted by Shepherd and Schwartz (PX 15 at 25–26); the possibility of a not guilty finding if the case went to trial (PX 15 at 27–31); and the range of penalties imposed in comparable cases in the past. (PX 15 at 31).

Finally, the officers clearly were not happy about Alvarez's allegations. (*See* PX 17 at 18–20; PX 15 at 39–41). As Suarez put it:

I became aware of a lawsuit that [Alvarez] had with the City some time after—probably a couple of months after we had discussed the training sergeant aspect of the office with him and he was never made training sergeant at that time. And I then learned that he got some kind of a settlement out of that. Whether or not he's looking for more money out of that or whatever it is, I have no idea. What I do know is in my reading of those articles and the different things that he's saying this office told him to do and looking at the way I personally treated him in the office, the way I feel about myself, Commissioner Lubin and Captain Bradley ... we've always treated Gil like a gentleman, whatever he needed we accommodated him, as far as his tours go, he's been accommodated, he's been relied upon with (inaudible) cases, I cannot understand the basis of these allegations. For him to say that he was told not to fully prosecute a case, to not put certain evidence on, to not put a photograph in his direction, don't put this in, it's mind boggling, I can't understand that, the[y're] outright—it's not true .... I do know that he's expressed his pleasure with being in the office, he's told me he likes being in the office, he doesn't want to go anywhere else, he feels he has a home here and then I happened to be out sick at the time, that the article in the papers and I got [a] call at home from Captain Bradley and Commissioner Lubin and had the

office for quite a while and was well thought of ... [and] that is why we placed him in CCRB.... My overall assessment of Sergeant Alvarez in the office is he—he's done an excellent job." (PX 16 at 5, 20). Lubin, now the Assistant Commissioner of the Department Advocate's Office, stated: "Gil was one of the better trial

attorneys in the office and he was also one of our most productive attorneys." (PX 17 at 6).

Likewise, Sergeant Herbert Woods, who was interviewed as a witness on June 25, 1998, stated: "Currently ... Gil is one of my attorneys .... I would consider him one of my best attorneys ...." (PX 14 at 7).

Times article faxed to my house and I just couldn't believe what I was reading. . . .

(PX 15 at 39–40).

### 3. *The May 29th and June 9th Interviews*

The SIU conducted two additional PG 118–9 interviews of Alvarez, one on May 29, 1998 (*see* PX 3) and one on June 9, 1998 (PX 4, 5). At the start of both interviews, Alvarez was advised that he was present as a "witness" and that there were "no allegations" or "specific allegations" against him. (PX 3 at 3; PX 4 at 3). On both occasions he was also advised that his refusal to testify or answer questions relating to the performance of his duties could lead to department charges that could lead to dismissal. (PX 3 at 3; PX 4 at 3). He was advised at the beginning of the first session that the investigation was into allegations made by Alvarez of misconduct by members of the Department Advocate's Office, including specifically allegations relating to the Schwartz and Shepherd case. (PX 3 at 3–4). Alvarez was also advised at the outset of the first session that he would be questioned on the verified complaint that he had filed in *Alvarez II*. (PX 3 at 4, 5).

During the course of the first session, Alvarez was questioned extensively on when he became a "Training Sergeant," what he did as a Training Sergeant, who purportedly appointed him a Training Sergeant, and when and how he was removed from his position as a Training Sergeant. (*See* PX 3 at 9–29, 32–33). He was asked specifically about the allegations he had made in *Alvarez II* that he had been told he was going to be promoted to the position of "Team Leader" and that he was not made a Team Leader for retaliatory reasons. (PX 3 at 33–37). At one point Zelman objected to questions about the "retaliation lawsuit" and the following colloquy occurred:

CAPTAIN JAMES WATERS: Who retaliated against you?

ATTORNEY BONITA E. ZELMAN: Whoever decided not to promote him. Now you're going to ask him about his lawsuit, that's not the subject matter of what we're here for. Who retaliated against him is not the subject matter of what he's here for as a witness.

MR. RICHARD KUBICK: It is the subject matter.

[ZELMAN]: No it's not. We were told that . . . the subject matter was his allegations against other members of the service of wrongdoing.

[WATERS]: Counsel you were told as a courtesy what some of the topics . . .

[ZELMAN]: Nothing here is a courtesy.

[WATERS]: Prior to this . . .

[ZELMAN]: That's not a courtesy.

[WATERS]: PG hearing.

[ZELMAN]: That is because he has a right under the PG for me to know the nature of the accusation. You never told us that you were going to be asking about . . .

[WATERS]: There's no accusation here.

[ZELMAN]: About his lawsuit.

[KUBICK]: Sergeant Alvarez is a witness here, [and] we want to find out who we're going to have to investigate in this. He's made certain allegations of misconduct. He's made them in the press.

(PX 3 at 37). Eventually, however, Alvarez gave answers to the questions, over his attorney's objection, because he was ordered to:

[WATERS]: Okay. I'm going to stop this right now, Sergeant I'm going to direct you to answer my question, you understand?

. . .

[ZELMAN]: Note my objection.

. . .

[WATERS]: Any member of this department can you identify that may have retaliated against you in not giving you one of these positions or giving you these positions . . . and then taking it away from you. I want you to name them.

[ZELMAN]: I'm objecting to that.

[WATERS]: It's noted, answer the question Sergeant.

[ZELMAN]: Did you give him a direct order?

[WATERS]: That's a direct order Sergeant.

(PX 3 at 39–40). Alvarez was probed on his claim of retaliation and he was ordered to identify and produce, on short notice, any evidence he had to support his claim of retaliation. (PX 3 at 21, 24, 41, 45–48). Eventually, Alvarez was examined extensively about the case against Shepherd and Schwartz and his handling of it. (PX 3 at 49–50, 58–91).

The PG 118–9 hearing continued on June 9, 1998 with more questions about the Shepherd and Schwartz case. (PX 4 at 7, 9–73). Alvarez was also asked whether he ever examined cases assigned to the CCRB team where officers accused of brutality and misconduct against minorities were "intentionally undercharged" so that the officers would not be dismissed, an allegation he had made in his complaint in *Alvarez II.* (PX 5 at 35–37). He was also asked whether he had examined cases in which minority police officers were disciplined more harshly than non-minority officers on similar charges. (PX 5 at 37–43).

At the conclusion of the June 9th session, Alvarez was instructed as follows:

> CAPT. JAMES WATERS: You're not to discuss this matter with anybody else that's a potential witness and if you're unsure whether or not the person is a potential witness don't discuss the matter. Can I make myself any clearer than that, if in doubt don't discuss it.
>
> SGT. GIL ALVAREZ: Yes, sir.
>
> [WATERS]: Do you understand?
>
> [ALVAREZ]: Yes, sir.

(PX 5 at 67; *accord* 11/30/98 Tr. at 18–19).

### D. *The Disciplinary Charges*

On July 15, 1998, the NYPD issued Charges and Specifications, charging Alvarez with fifteen "specifications" of violating NYPD regulations. (PX 12; *see* 11/30/98 Tr. at 21). Eleven of the fifteen charges alleged that Alvarez made "false official statements" in his "Verified Complaint" and "Amended Complaint" in *Alvarez II.* Ten of those eleven charged that the false statements were made in an "Official Department Interview" as well.

This case was commenced on October 14, 1998. Alvarez and his new attorneys made immediate application for a temporary restraining order and preliminary injunction. At the request of the Court, the NYPD agreed to defer the disciplinary proceedings against Alvarez pending a decision on the motion.[4]

On October 16, 1998, the Corporation Counsel's Office wrote the Court asking permission to serve amended charges on Alvarez. I granted that permission and the NYPD served amended charges in the form of a document entitled "Amendment of Charges and Specifications." (PX 9). The copy provided to the Court is unsigned and is dated August 20, 1998. (*Id.*).

The amended charges deleted all references to the verified complaint and amended complaint in *Alvarez II,* with one exception (Specification 15). For example, the original specification 10 reads:

> Said Sergeant Gil Alvarez, while assigned to the Department Advocates' Office (DAO), *in a Verified Complaint dated April 3, 1998, and in an Amended Complaint dated May 26, 1998, both of which were filed in the United States District Court for the Southern District of New York by his attorney,* and in an Official Department Interview dated June 9, 1998, made false official statements, to wit: regarding a case which Respondent was preparing for trial pursuant to his duties at the DAO, Respondent falsely stated, "On February 23, 1998, (Respondent) was ordered over his objection, not to … have the complainant and Medical Examiner testify at trial."

(PX 12, spec. 10) (emphasis added). The amended specification reads:

> Said Sgt. Alvarez, while assigned to the Department Advocates Office (DAO), in an Official Department Interview dated June 9, 1998 made false official statements, to wit: regarding a case which Respondent was preparing for trial pursuant to his duties at the DAO, Respondent falsely stated, "On February 23, 1998, (Respon-

---

4. I permitted the NYPD to proceed with a conference and to schedule the trial if it wished, as long as the trial was not held prior to my deciding the motion. (*See* 10/14/98 Tr. at 8).

dent) was ordered over his objection, not to ... have the complainant and Medical Examiner testify at trial."

(PX 9, spec. 10).

Specification 15, which was not substantially changed in the amended charges, reads:

Said Sgt. Alvarez, while assigned to the Department Advocates Office (DAO), in a Verified Complaint dated April 3, 1998, and in an Amended Complaint dated May 26, 1998, both of which were filed in the United States District Court for the Southern District of New York by his attorney, did wrongfully publish confidential communications between DAO supervisors and himself.

(PX 9, spec. 15; see also PX 12, spec. 15 (same)).

On December 4, 1998, several days after the completion of the evidentiary hearing on Alvarez's motion, the Corporation Counsel's Office wrote the Court and submitted yet further amended charges. The December 4th letter states in part:

An issue was raised [at the preliminary injunction hearing] regarding the accuracy of the quotations attributed to plaintiff in the amended charges and specifications, dated August 20, 1998.

The police department will be serving the attached second set of amended charges and specifications. While the current charges and specifications refer to the substance of plaintiff's false statements at the P.G. 118–9 hearings, the amended charges more accurately reflect plaintiff's exact language. In addition, several of the previous specifications have been omitted in their entirety.

(Letter from Steven Weiss, Esq., to the Court, dated Dec. 4, 1998). Specification 15 was among those omitted entirely.

### DISCUSSION and CONCLUSIONS OF LAW

In this case, Alvarez asserts four causes of action. The first alleges violations of his First Amendment right to "petition the government for redress of grievance" or to obtain "unimpeded access to the courts." (Cmplt.¶ 14). The second, third, and fourth allege that defendants violated Title VII, the New York State Human Rights Law, and the New York City Administrative Code, respectively, by retaliating against Alvarez for filing *Alvarez II*. Before the Court is Alvarez's motion for a preliminary injunction.

### 1. Applicable Legal Standards

#### A. Standard for Preliminary Injunction

■ A preliminary injunction is "an extraordinary remedy ... that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 117 S.Ct. 1865, 1867, 138 L.Ed.2d 162 (1997) (quoting 11A Charles Wright, *et al.*, *Federal Practice & Procedure* § 2948, at 129–30 (2d ed.1995)). Injunctions are "the most intrusive sort of judicial relief," especially in the context where, as here, a court is asked to interfere with the investigative process of a municipal agency. *Tribune Co. v. Abiola*, 66 F.3d 12, 16 (2d Cir.1995). Accordingly, in cases such as this, the "availability of injunctive relief must be considered with an eye toward the important policies of federalism." *Steffel v. Thompson*, 415 U.S. 452, 481, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

■ To obtain preliminary injunctive relief, a party must demonstrate (1) a threat of irreparable harm and (2) either (a) a likelihood of success on the merits or (b) "sufficiently serious questions going to the merits to make them fair grounds for litigation *and* a balance of hardships tilting decidedly towards the plaintiff." *See Jayaraj v. Scappini*, 66 F.3d 36, 38 (2d Cir.1995) (emphasis in original). Where, as here, however, a party seeks to enjoin governmental action, he or she may not rely on the less rigorous "serious questions" alternative of the second prong, but instead must demonstrate a likelihood of success on the merits. *See Able v. United States*, 44 F.3d 128, 131 (2d Cir.1995); *Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989); *Association of Legal Aid Attorneys v. City of New York*, No. 96 Civ. 8137, 1997 WL 620831, at *2 (S.D.N.Y. Oct. 8, 1997).

## B. The Right to Petition for Redress

The First Amendment protects "the right of the people ... to petition the Government for a redress of grievances." U.S. Const. amend. I. As the Supreme Court has held, "[t]he right to petition is cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression." *McDonald v. Smith*, 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985). One aspect of the right to petition is "[t]he right of access to the courts," and the right to petition for grievances may be exercised by filing a lawsuit and petitioning the courts for relief. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

▮▮▮▮ Like the right to free speech, the right to petition is not "absolute." *McDonald v. Smith*, 472 U.S. at 484, 105 S.Ct. 2787. There are limitations to the protection. For example, although "filing a complaint in court is a form of petitioning activity ... 'baseless litigation is not immunized by the First Amendment right to petition.'" *Id.* (quoting *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983)). As the Supreme Court has made clear, the petition clause will not protect "sham" litigation. *Bill Johnson's*, 461 U.S. at 741, 103 S.Ct. 2161 (quoting *California Motor*, 404 U.S. at 511, 92 S.Ct. 609). The Court explained:

> The first amendment interests involved in private litigation—compensation for violated rights and interests, the psychological benefits of vindication, public airing of disputed facts—are not advanced when the litigation is based on intentional falsehoods or on knowingly frivolous claims. Furthermore, since sham litigation by defini-

tion does not involve a bona fide grievance, it does not come within the first amendment right to petition.

*Id.* 461 U.S. at 743, 103 S.Ct. 2161 (quoting Balmer, *Sham Litigation and the Antitrust Laws*, 29 Buff. L.Rev. 39, 60 (1980)).

At the same time, there must be some room for good faith error. In the prison context, for example, courts have held that:

> [W]hen the right to petition is in question, there is also a heightening of requirements to show falsity or frivolousness of complaints, similar to that observed in the 'free speech' realm .... The courts must not only tolerate, but must impose constitutional protection of the right of petition to an extent that necessarily encompasses some false claims in order to prevent an unconstitutional chill on complaints that matter.

*Hancock v. Thalacker*, 933 F.Supp. 1449, 1486–87 (N.D.Iowa 1996); *accord Bradley v. Hall*, 64 F.3d 1276 (9th Cir.1995) (prison rules permitting inmates to be disciplined for filing grievances containing "disrespectful" language placed unconstitutional burden on their right of access to courts); *see also Pickering v. Board of Educ.*, 391 U.S. 563, 574, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) ("absent proof of false statements knowingly or recklessly made ... [an employee]'s exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment").

## C. Retaliation

▮▮▮ The First Amendment petition clause protects a public employee from being retaliated against for exercising his right to petition for grievances by filing a lawsuit. *See Gagliardi v. Village of Pawling*, 18 F.3d 188, 194–95 (2d Cir.1994).[5] Likewise, Title VII

---

5. The Second Circuit has held that the "interest-balancing principles" that govern a public employer's ability to dismiss an employee for speaking on matters of "public concern" apply also to "right-to-petition" cases. *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1059 (2d Cir.) (right to petition the government for grievances "is 'generally subject to the same constitutional analysis' as the right to free speech") (quoting *Wayte v. United States*, 470 U.S. 598, 610 n. 11, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)), *cert. denied*, 510 U.S. 865, 114 S.Ct. 185, 126 L.Ed.2d

144 (1993); *see also Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The issue thus arises as to whether public employees are protected by the petition clause from retaliation for exercising their right of access to the courts when their lawsuit involves a matter of "personal interest" rather than a matter of "public concern." In *San Filippo v. Bongiovanni*, 30 F.3d 424, 441–42 (3d Cir.1994), *cert. denied*, 513 U.S. 1082, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995), the Third Circuit answered the ques-

(and the analogous state and city anti-discrimination laws) protect against retaliation for filing a discrimination claim or otherwise opposing a discriminatory practice. 42 U.S.C. § 2000e–3.

■ Although there are slightly different variations on the elements of a retaliation claim in a right-to-petition case and under Title VII, the key is whether an employee is subjected to adverse employment action at least in part because the employee engaged in protected activity. *See, e.g., Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768–69 (2d Cir.1998) (Title VII retaliation); *Gagliardi*, 18 F.3d 188 (retaliation in right-to-petition case). Whether that protected activity is exercising the right to petition the government for grievances by filing a lawsuit or whether it is opposing an allegedly discriminatory practice by filing a charge of discrimination or lodging a complaint with management, the employee is protected from retaliation.

■ All too often, however, employers react negatively to the assertion of a claim and consequently turn a weak discrimination case into a strong retaliation case. As Judge Cabranes recently observed:

> It sometimes happens—more frequently than might be imagined—that an employee whose primary claim of discrimination cannot survive pre-trial dispositive motions is able to take to trial the secondary claim that he or she was fired or adversely affected in retaliation for asserting the primary claim.

*Quinn*, 159 F.3d 759, 762. The fact that the "primary claim" is unsuccessful does not preclude a claim for retaliation, for "[a] finding of unlawful retaliation is not dependent on the merits of the underlying discrimination complaint." *Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir.1986). Rather, an employee engages in "protected

activity," and is therefore protected from retaliation, as long as there is a "good faith, reasonable belief" that the employer had violated the law. *Quinn*, 159 F.3d 759, 769 (quoting *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988)); *see also Anderson v. Davila*, 125 F.3d at 162 (in First Amendment right-to-petition case, holding that an employee who filed lawsuit needed only to show that "his lawsuit was not frivolous in order to make out a prima facie retaliation claim").

### 2. *Analysis*

#### A. *Irreparable Harm*

■ In *Alvarez II*, I denied Alvarez's motion for a preliminary injunction to enjoin the NYPD from proceeding with its investigation into the alleged misuse of the confidential information in part because I was not persuaded that Alvarez would suffer irreparable harm if the investigation proceeded. 2 F.Supp.2d at 514–15. I rejected Alvarez's contention that his right to free speech would be "chilled" by the investigation and I also found that his alleged emotional harm could be adequately redressed by money damages.

The circumstances, however, have changed. I am persuaded that the actions taken by the NYPD *after* the filing of *Alvarez II* present a threat of irreparable harm. The commencement and prosecution of the departmental disciplinary proceedings against Alvarez for making purportedly false statements in his complaint in *Alvarez II* is directly interfering with his right of access to the courts and his ability to vindicate his rights under Title VII. For example:

First, during the PG 118–9 interviews, Alvarez's superior officers were able to order him to answer questions, over his attorney's objections. If he had refused to answer the questions, he would have been subject to dismissal. As one of the interrogating offi-

---

tion affirmatively. *See also Anderson v. Davila*, 125 F.3d 148 (3d Cir.1997) (the "public concern" requirement "does not apply in cases where the speech itself constitutes the plaintiff's lawsuit").

I do not reach the question, for even assuming a public employee is protected from retaliation for filing suit only if the suit involves a matter of public concern, *Alvarez II* clearly raises issues of

public concern—allegations of a cover-up of police brutality and a claim of retaliation against an employee for refusing to participate in the cover-up and for complaining of discrimination. Indeed, the publicity generated by the filing of *Alvarez II* is strong testament to the fact that it involves matters of public concern.

cers said to Alvarez's attorney at one of the hearings: "[I]f he refuses to answer questions, he will be suspended and the Department will take procedures—we'll, we'll embark on procedures designed to terminate him from the Police Department." (CX A at 19; *see also* PX 3 at 3, 39–40; PX 4 at 3). In addition, the questions were put to him by as many as three officers at once, officers who were part of the management of the very entity he was suing.

Second, the officers conducting the interviews were able to order Alvarez to produce, on short notice, whatever evidence he had to support his claim of retaliation. (PX 3 at 21, 24, 41, 45–48). Of course, this is evidence that he would use to prosecute *Alvarez II,* and yet the NYPD was able to order him to produce it outside the ordinary channels available in the lawsuit.

Third, the officers were able to order Alvarez not to talk to potential witnesses. At the conclusion of the third session, Waters instructed Alvarez as follows:

> You're not to discuss this matter with anybody else that's a potential witness and if you're unsure whether or not the person is a potential witness don't discuss the matter. Can I make myself any clearer than that, if in doubt don't discuss it.

(PX 5 at 67). Alvarez responded: "Yes, sir." (*Id.*). Hence, Alvarez was given a direct order, during the pendency of *Alvarez II,* not to discuss the "matter" with any "potential witness." Such an order obviously would interfere with his ability to prosecute his lawsuit.

Fourth, although the NYPD was able to order Alvarez to answer questions and produce evidence, it was not required to provide reciprocal discovery. In response to Alvarez's attorney's repeated requests for information and clarification, the examining NYPD officers largely refused, taking the

position that Alvarez was "not entitled to full discovery until eight days before [the] case goes to trial." (CX A at 39). Hence, at the same time that the NYPD was gathering evidence that it will be able to use to defend *Alvarez II,* Alvarez was being precluded from gathering evidence to prosecute it.

Hence, Alvarez's ability to prosecute *Alvarez II* is actually being impaired by the NYPD's disciplinary proceedings and he is likely to continue suffering this injury if the disciplinary proceedings are not enjoined.[6] In the free speech context, the Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (Brennan, J., plurality opinion) (citation omitted). This principle applies with equal force here. *See also United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) (right to petition for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights").

### B. *Likelihood of Success*

I conclude also that Alvarez has demonstrated a likelihood of success on the merits, for he has shown that he is likely to succeed on his claim that the disciplinary proceedings were brought in retaliation for his filing of *Alvarez II. See generally Anderson v. Davila,* 125 F.3d 148 (3d Cir.1997) (former police officer demonstrated likelihood of success on claim that he was being retaliated against for filing EEOC charge and lawsuit alleging discrimination by police department); *O'Brien v. Town of Caledonia,* 748 F.2d 403 (7th Cir.1984) (holding police officer was entitled to preliminary injunction against institution of disciplinary proceedings where he had

---

**6.** In *EEOC v. Locals 14 and 15,* 438 F.Supp. 876 (S.D.N.Y.1977), Judge Tenney wrote:

Part of th[e] duty of the government to provide the protection of law is that litigants and witnesses who appear before federal courts do so secure in the knowledge that they cannot be harassed, intimidated, punished or otherwise suffer harm because they availed themselves of the judicial system. The insult that such retaliation against litigants or witnesses would produce goes beyond the injuries suffered by the individuals themselves: the integrity of the court's process and proceedings suffers the inevitable and intolerable destruction that accompanies any retaliation against the witnesses.

438 F.Supp. at 879 (citations omitted).

substantial likelihood of success on his First Amendment claim).

First, there can be no doubt but that the disciplinary proceedings were prompted by Alvarez's filing of *Alvarez II*. Eleven of the original fifteen Charges and Specifications specifically referenced Alvarez's verified and amended complaints in *Alvarez II*. Many of these specifications contain direct quotations from the *Alvarez II* complaint. (*Compare, e.g.,* PX 12 ¶ 2 *with* PX 13 ¶ 46; PX 12 ¶ 5 *with* PX 13 ¶ 27; PX 12 ¶ 5 *with* PX 13 ¶ 32). Acknowledging the strong appearance of retaliation, the NYPD sought to minimize that appearance by deleting the references to the verified and amended complaints. Specification 15 remained intact, however, and it continued to make explicit reference to the lawsuit. The NYPD's recent effort to amend the specifications a second time only further demonstrates that the original charges were motivated by Alvarez's filing of the lawsuit.

Second, the sequence of events also points strongly in favor of a conclusion of retaliation. The filing of *Alvarez II* was followed almost immediately by an investigation that focused primarily on Alvarez, even though others were purportedly the subjects of the inquiry. The investigation went well beyond the original subject—the alleged misuse of confidential information—to cover matters that were clearly the subject of *Alvarez II*.

Third, the NYPD obviously was unhappy about the publicity that was generated by the filing of *Alvarez II*. This unhappiness is evident from the comments of some of the individuals involved either as subjects or interrogators. Three officers were charged with a cover-up and retaliation, and the officers were faxing the *New York Times* article to each other at home.

Finally, there was an edge and intensity to the questioning of Alvarez during the PG 118–9 interviews that is suggestive of an intent to retaliate. Part of the tone of the questioning can perhaps be explained as a reaction to the aggressive defense mounted by Alvarez's attorney and Alvarez's evasiveness, but it would also appear that much of the tone was attributable to the NYPD's unhappiness with Alvarez and skepticism about his allegations.

It may be that in the end *Alvarez II* will fail. I denied the motion for a preliminary injunction. Many if not all of the events complained of occurred prior to the execution by Alvarez of a general release. I have read the transcripts of the PG 118–9 interviews of Suarez, Bradley, and Lubin as well as all the transcripts of Alvarez's interviews, and I am not at all persuaded that there was any attempt to cover-up the Shepherd and Schwartz case. Hence, in some respects, the NYPD's unhappiness with Alvarez is understandable. He and his attorney made serious allegations that embarrassed the entire department as well as individual officers. The allegations were made not only in a complaint filed in federal court but to the press, and the allegations received extensive media coverage. Yet, in the view of the NYPD, the allegations were false.

At the same time, even assuming for purposes of this motion that the allegations are false, I do not believe *Alvarez II* is a sham or frivolous lawsuit, nor do I believe that Alvarez brought it in bad faith or maliciously. His claims are not completely without support. For example, there is some documentation to support his claim that he was a "training sergeant" or "assistant training officer." (PX 6, 7). Schwartz and Shepherd received penalties—the loss of 20 vacation days each—that would appear to be extremely light for what they did. Villa apparently believes that the disciplinary case was not pursued in the manner it should have been. Under these circumstances, even assuming the allegations in *Alvarez II* are ultimately proven false, it appears, at least at this juncture, that Alvarez had a good faith, reasonable basis for making them.

Accordingly, because *Alvarez II* is pending, the NYPD may not take the matter into its own hands. Rather, the NYPD should attack the allegations in this Court, within the context of the lawsuit.

### C. *Balancing of Hardships*

Although I do not need to reach the issue of the balancing of hardships, it is useful for me to do so.

If an injunction is not issued, Alvarez will be irreparably harmed. He will have great difficulty prosecuting *Alvarez II,* and both his First Amendment right to petition the government for grievances and his right to seek relief under Title VII and the state and city anti-discrimination laws will be seriously impaired.

On the other hand, if an injunction is issued and the NYPD is enjoined from proceeding with the disciplinary proceedings, the NYPD will still have the ability to aggressively challenge Alvarez's allegations by defending *Alvarez II.* It will not be prejudiced by the risk of evidence turning stale because it will still be able to gather its evidence within the context of the lawsuit. The case will be put on a fast track so that the issues will be disposed of promptly.

While I would ordinarily be reluctant to interfere in the NYPD's internal personnel matters, here the situation is not purely an internal one. Rather, Alvarez filed suit in this Court and the NYPD's disciplinary proceedings are interfering with the orderly functioning of proceedings in this Court. Hence, the considerations of comity and federalism that would ordinarily weigh against federal intervention into a pending departmental inquiry do not come into play. *See, e.g., McDonald v. Metro–North Commuter R.R. Div. of Metro. Transit Auth.,* 565 F.Supp. 37 (S.D.N.Y.1983) (comity required that federal court refrain from enjoining Transit Authority's decision to suspend police officer).

In the end, if the NYPD prevails and it demonstrates that Alvarez's claims were indeed frivolous and brought in bad faith, it will be able to seek sanctions within the lawsuit, and it will be able to take whatever other action would be permitted by law.

### CONCLUSION

Plaintiff's application for a preliminary injunction is granted. Defendants are hereby enjoined, during the pendency of this lawsuit, from further prosecuting the disciplinary proceedings that have been commenced against plaintiff.

*Alvarez II* is hereby consolidated with this case. All discovery in these consolidated cases shall be completed by March 12, 1999. A pretrial conference will be held on that day at 10 a.m.

SO ORDERED.