Young, J.
(concurring).
Given that we are constrained to follow our best understanding of the United States Supreme Court’s direction concerning the Petition Clause, I write separately to suggest that a proper application of the rules of constitutional interpretation produces a result contrary to that reached in McDonald v Smith, 472 US 479; 105 S Ct 2787; 86 L Ed 2d 384 (1985). I believe that, under an originalist interpretation of the Petition Clause, the defendant union and union representative would enjoy an absolute immunity from plaintiff’s suit for their petitioning activity. Should the Supreme Court of the United States seek to revisit its Petition Clause jurisprudence, there is significant, persuasive historical evidence suggesting that the contemporary under *736 standing of the Petition Clause as announced in McDonald is incompatible with the original understanding of the Petition Clause.
If our majority has correctly determined that McDonald stands for the proposition that, at least concerning defamation immunity, the sibling clauses of the First Amendment have no distinctive meaning under our Constitution, I believe McDonald was incorrectly decided. Further, an attempt to import constitutional law on defamation involving free speech and free press to situations involving the right to petition raises questions about the soundness of such a principle, as exemplified by our application of the private-figure and public-figure dichotomy to the present case.
Accordingly, by laying out the historical record supporting a conclusion based on an originalist understanding of the Petition Clause, it is my hope that the United States Supreme Court may choose an alternative course to the one suggested by McDonald.
I. THE PETITION CLAUSE
A. THE RULES OF CONSTITUTIONAL INTERPRETATION
In interpreting a constitution, the primary objective is to discern the original intent of the constitutional text. See, e.g., Utah v Evans, 536 US 452, 491; 122 S Ct 2191; 153 L Ed 2d 453 (2002) (Thomas, J., concurring in part and dissenting in part, joined by Kennedy, J.); McIntyre v Ohio Elections Comm, 514 US 334, 359; 115 S Ct 1511; 131 L Ed 2d 426 (1995) (Thomas, J., concurring in judgment, quoting South Carolina v United States, 199 US 437, 448; 26 S Ct 110; 50 L Ed 261 [1905]); Michigan United Conserva *737 tion Clubs v Secretary of State, 464 Mich 359, 373; 630 NW2d 297 (2001) (Young, J., concurring); People v DeJonge, 442 Mich 266, 274-275; 501 NW2d 127 (1993). See also, 1 Story, Commentaries on the Constitution of the United States (4th ed, 1873), § 426, p 315 (Justice Story stated that the Constitution must “have a fixed, uniform, permanent, construction . . . not dependent upon the passions or parties of particular times, but the same yesterday, to-day, and forever”); Bork, The Tempting of America (New York: The Free Press, 1990), ch 7, pp 143-160; Scalia, A Matter of Interpretation (Princeton, NJ: Princeton University Press, 1997), pp 37-47. Further, the rights created under the Bill of Rights must be preserved as they existed in 1791. McIntyre, supra at 371-372 (Scalia, J., dissenting, joined by Rehnquist, C.J.) (stating that the traditional view held by the Court and society is that the Constitution’s original meaning is unchanging), Curtis v Loether, 415 US 189, 193; 94 S Ct 1005; 39 L Ed 2d 260 (1974) (a common-law action that becomes statutory is nonetheless protected by the Seventh Amendment’s right to trial by jury); Story, supra. This principle of interpretation follows inexorably from the fact that the People provided an explicit method and means for amending the Constitution. US Const, art V.
The questions presented in this case concern the meaning of the Petition Clause of the First Amendment. Accordingly, a thorough analysis of both the history of the practice of petitioning the government before its codification in 1791 as a part of the First Amendment and the common understanding of the text of the Petition Clause at that time is in order.
*738 B. THE ORIGINAL UNDERSTANDING OF THE PETITION CLAUSE
1. THE PRE-1791 HISTORY OF THE PETITION RIGHT
The right to petition has historical roots in Anglo-American constitutional history dating back to 1013. Smith, “Shall make no law abridging . . . An analysis of the neglected, but nearly absolute, right of petition, 54 U Cin L R 1153, 1154-1155 (1986) (discussing English nobles’ petition to Aethelred the Unready in 1013). Even before democracy was practiced in Great Britain, petitioning was recognized as a right granted by the royal sovereign to his subjects, as evidenced in the Magna Carta of 1215. Id. at 1155. Developing through the centuries, “petitioning reached enormous popularity” during the era of the Civil War and Interregnum in England. Id. at 1157. In fact, James I expressly provided “the Right of his subjects to make their immediate Addresses to him by Petition.” Id., quoting 5 Pari Hist Eng App ccxiv (1701) (Proclamation 10 July, 19 Jac). Charles I followed suit and it is documented as late as 1644 that he invited petitioning and promised that such petitioning would be heard. Id.
In the case of Lake v King, 1 Wms Saund 131, 85 Eng Rep 137 (1668), whether a defamation action could lie where the alleged defamatory statements were made while petitioning Parliament was at issue.[1] *739 In Lake, as in the present case, the libel at issue was civil in nature. Defendant King’s petition to Parliament allegedly defamed plaintiff Lake, yet it was held that because the defendant was petitioning Parliament, his statements were immune from liability. Thus, Lake established that absolute immunity from defamation actions attaches to a petition, regardless whether the petition contains libelous statements. Id.
If there were any question that petitioners in England were protected from defamation liability following Lake, The Case of the Seven Bishops, 12 Howell’s State Trials 183 (1688), and the monumental pivot in English constitutional history that immediately followed Seven Bishops appear to have resolved the matter. In April 1688, James II decreed that all churches read a declaration, “Liberty of Conscience,” at divine services, which directive many bishops and clergy refused to follow. After seven bishops petitioned to be relieved from the king’s mandate, they were prosecuted for seditious libel. Smith, supra at 1160-1161.
A central inquiry in Seven Bishops was whether the defendants were “petitioning” the king. Seven Bishops, supra at 320-321. Defense counsel advanced that the king’s indicting document — the information — was insufficient inasmuch as it presented the bishops’ allegedly libelous statements in an excerpted fashion, separated from the petition as a whole. The king’s prosecutors argued that the defamatory statements were delivered in the pretense of a petition and thus only the libelous paragraphs were germane. The reso *740 lution of this question was dispositive because unpopular political speech and press were prosecuted as seditious libel during this period in English history. Smith, supra at 1180. Accordingly, if the bishops’ statement was not properly communicated pursuant to the recognized petition right, namely, in a petition, the bishops were not immune and could have been rightly prosecuted for seditious libel. Following a lengthy discourse, the entire petition was permitted to be introduced into evidence and provided to the jury for its deliberations. The jury returned a verdict of not guilty. Id. at 1161.
Notwithstanding the verdict in Seven Bishops, James II appealed to the army to enforce his Liberty of Conscience decree. In response to the king’s appeal, much of the army declined, laying down their arms. Thereafter,
[a] convention of the peers and representatives of the realm resolved on January 28-29, 1689, that James II had broken the “original contract between King and people.” The crown was offered to William and Mary upon the condition that they accept the Declaration of Rights; acceptance was given on February 13, 1689. The Declaration of Rights provided “that it is the right of the subjects to petition the king, and all commitments and prosecutions for such petitioning is illegal.” [Smith, supra at 1162 (emphasis added).]
The adoption of this petition right in the English Bill of Rights evinces a clear understanding that the rule of Lake, that petitions to Parliament may not be the subject of defamation actions, was also the rule concerning petitions to the king. As the English codified petition right provided in 1689, it is the “right of the subjects to petition the king, and all commitments and prosecutions for such petitioning are illegal.” *741 Schnapper, “Libelous” petitions for redress of grievances-Bad historiography makes worse law, 74 Iowa L R 303, 315 (1989), quoting An Act declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown (The Declaration of Rights), 1 W & M, sess 2, ch 2 (1688-1689), 9 Statutes at Large 67, 69 (Pickering 1764). That the people of England intended their petitions to be immune from all penalty seems unquestionable in light of the textual language of the 1689 Declaration of Rights, particularity given the English people’s awareness of the Seven Bishops case and the historical events it prompted.[2]
Thus, Lake, the dispositive inquiry in Seven Bishops regarding whether the defendants’ speech was in petition form, and the historical effect of Seven Bishops are instructive about the scope and meaning of the petition right before 1791. First, they crystalize the common-law understanding in late seventeenth-century England that speech was absolutely immune when made in petition form. Second, the historical role that Seven Bishops had in inducing the creation of the English Bill of Rights (Declaration of Rights) and the explicit inclusion of the right to petition in the English Bill of Rights immediately following the Seven Bishops decision reinforce the foundational understanding of the importance and full scope of the right to petition. Finally, the elementary distinctions maintained between the freedoms of speech and press and the right to petition in the seventeenth century is evident in Lake and Seven Bishops, where the outcomes were influenced by whether the defendants’ *742 statements were made while petitioning because the same subject matter spoken outside the petitioning activity was not protected. Smith, supra at 1177, 1180.
“The American colonies adopted and adapted the right to petition from petition’s English precursors.” Mark, The vestigal constitution: The history and significance of the right to petition, 66 Fordham L R 2153, 2161 (1998). “In no case did the colonial affirmation of the right narrow the English right.” Id. at 2175. Indeed, our Declaration of Independence is the most famous example of the colonists’ commonplace use of petitioning as a recognized political right:
We have Petitioned for Redress in the most humble terms: Our repeated Petitions have been answered only by repeated injury.
Following the drafting of the Constitution in 1787 and its ratification in 1789, it became clear that the Anti-Federalists would demand amendments to the Constitution to assure the continued protection of the well-understood natural rights that a self-governing people do not forfeit to their government. Mark, supra at 2207. Regarding consideration of the petition right, what arose was a focus on the role of the petition right in the new national governmental experiment and, more directly, an exhaustive dialogue regarding whether any petitioning should be accompanied by the power to instruct the people’s representatives. Instruction was ultimately rejected.
No discussion is recorded that challenged the protective scope of the petition right recognized under English law and practiced in the colonies, including the protection from defamation under the case law of *743 Seven Bishops and Lake. Schnapper, supra at 345 (1989) (stating that “there is absolutely no contemporaneous history suggesting that anyone connected with the framing and approval of the petition clause harbored any objection to or intended any limitation on the right to petition as it had existed under English law prior to the Revolution and as it continued in the several states.”). Accordingly, the lack of any discussion regarding limiting the petition right as it was understood at that time undoubtedly suggests that the Petition Clause that was ratified as a part of the First Amendment, in 1791, embodied the same petition right present in the English Bill of Rights and freely practiced in colonial America.
In fact, even codified qualifications on the petition right found in several colonial and early state declarations of rights were not included in the First Amendment Petition Clause.[3] Smith, supra at 1181-1182. Without textual references in the Petition Clause itself suggesting otherwise, and the rejection in the adopted Petition Clause of any of the minor qualifications that were prescribed by individual colonies and states, the compelling conclusion is that the First Amendment drafters and ratifiers intended the broad petition protection that had been recognized in England and practiced in the colonies.
This conclusion is fortified by the contentious debate that occurred regarding the lack of a Bill of
*744 Rights in the original Constitution. Bowen, Miracle at Philadelphia (Boston: Atlantic-Little Brown, 1966), ch XXI, pp 243-253. Anti-Federalists were astounded that the proposed Constitution failed to expressly protect the rights of free people that dated back to the Magna Carta. Id. at 245; The Federalist (New York: Barnes & Nobel, Wright ed, 1996), p 15. The Federalist response was not, however, that these rights should not be protected or should be protected differently than they had been in the past. Rather, the Federalists advanced, inter alia, that the rights of man were so well established and understood that the listing of them was not only unnecessary, as the federal government could not touch them, but dangerous inasmuch as it would be impossible to list all the natural rights of man. Hamilton, Federalist No 84 (available at Wright ed, supra at 535); Bowen, supra at 245.
Therefore, the 1787-1789 debate whether to include a bill of rights in the Constitution reveals that neither the Federalists nor Anti-Federalists questioned the vitality of the various rights specifically proposed to be listed in such a bill of rights, rights that were eventually adopted in 1791. Rather, these rights were admitted to exist and be preserved as rights natural to all men in the new Constitution, and the debate on these rights concerned only whether they should be constitutionally codified. Accordingly, this 1787-1789 discussion of the rights that were eventually incorporated as the Bill of Rights in 1791 is persuasive support for the proposition that the drafters and ratifiers of the Petition Clause clearly understood what the petition right meant: what it had always meant.
*745 In colonial America, two characteristics of the petition right further disclose the broad reach and distinctive role the right was understood to have in our new republic. First, just as the petition right protected the king’s subjects in England from prosecution for libel, petitioning was available in America to the enfranchised as well as the disenfranchised. Petitioning was apparently one of the few mechanisms by which the disenfranchised joined the enfranchised in the political life of colonial America. Mark, supra at 2169-2170. In fact, the right to petition was considered so fundamental to the operation of government that in documented cases “women, free blacks, and even slaves, were allowed to petition” in colonial America, as were prisoners. Smith, supra at 1172; see also Mark, supra at 2181-2184 (citing Bailey, Popular Influence Upon Public Policy: Petitioning in Eighteenth Century Virginia [Westport, CT: Greenwood Press, 1979], pp 43-46).[4]
This broad availability of the right of petitioning government was contemporaneous with explicit statutory limitations on freedom of speech and press that were enacted and practiced in colonial America. Smith, supra at 1171 (discussing licensing of the press and punishment for offensive political speech in Massachusetts, Pennsylvania, and New York as late as the early 1720s); see also Garry, The American Vision of a Free Press (New York: Garland Publishing, 1990). “Seditious libel laws existed in all of the colonies, and *746 punishment for statements critical of the government was an accepted, lawful practice which continued even after the framing and ratification of the First Amendment.” Spanbauer, The First Amendment right to petition government for a redress of grievances: Cut from a different cloth, 21 Hastings Const L Q 15, 37 (1993). Yet, the presentation of a petition to the government was not considered a “publication” under the libel laws in both England and colonial America. Id. at 38; see also Ciar, Comment, Martin v City of Del City: A lost opportunity to restore the First Amendment right to petition, 74 St John’s L R 483 (2000).
In addition, while there is a clear indication that the First Amendment drafters rejected the idea that the people could “instruct” their representatives, the understanding of the petition right in 1787 was that petitioning was such an influential force in the idea of self-government that it included the right to consideration and response. Mark, supra at 2204-2212. In other words, the filing of a petition with the government entitled the petitioner to legislative consideration of the petition, as well as a legislative response to the petition.
Interestingly, one of the most powerful indications of the breadth of, and political importance attached to, the right of petition in the early days of the United States occurred within its first years of founding and immediately before the adoption of the Bill of Rights. The filing of the Quaker petitions in the 1st Congress in 1790, concerning demands for ending the practice of slavery, occasioned what many congressional members considered a constitutional crisis that might destroy the fragile new national government. See *747 Ellis, Founding Brothers (New York: Knopf, 2000), ch 3, pp 81-119. What is remarkable for constitutional analysis is not that such politically and constitutionally explosive petitions were filed, but why the petitions were not simply ignored by America’s new Congress and why none of the Quaker petitioners was threatened with prosecution for defamation or sedition.
It is well understood that one of the significant constitutional compromises that was struck in order to gain approval within the Constitutional Convention (and eventually among the colonies that were to adopt the proposed constitution) was the Sectional Compromise. The question of how to address the slavery issue in a national government proved to be impossible for the drafters to wholly resolve. Ellis, supra at 85-86. Consequently, the Sectional Compromise placed the issue of the slave trade beyond the powers of the federal government until 1808, by adding article I, § 9, cl 1, to the Constitution.[5] Ellis, supra at 85-86. It was believed that by thus placing the importation-of-slaves question beyond congressional reach the issue of slavery would not raise its divisive and insoluble head, at least in the early days of the Union. Bowen, supra at 200-204. However, the founders and ratifiers who so believed had not reckoned on the passionate abolitionist Quakers of the Northeast who well understood and would exercise their right to petition. Ellis, supra at 81.
*748 Notwithstanding clause 1 of article I, § 9, upon receipt of the Quaker petitions, one personally endorsed by Benjamin Franklin, the 1st Congress was immediately convulsed over how to proceed. Id. at 81-119. There was much debate about whether the Quaker petitions should be read in the House chamber because of their potential to rekindle a question the drafters of the Constitution, a number of whom were members of the 1st Congress, were unable to resolve other than by constitutionally deferring its consideration for twenty years. Ellis, supra. Eventually, the Congress resolved to refer the Quaker petitions to a special committee for a more private consideration. Thereafter, the 1st Congress adopted a resolution permanently precluding the consideration of the slavery question.[6] Id.
Again, even given the constitutional crisis that the Quaker petitions posed for the new national government, the remarkable thing about this historic episode is that there does not appear to be any indication that the 1st Congress believed it could simply ignore the petitions, despite Article I, § 9, cl 1. More important, these petitioners were not prosecuted for what at least the southern members of Congress *749 undoubtedly considered libelous, seditious statements.
2. THE TEXT OF THE PETITION CLAUSE
As a textual matter, I note that although the United States Supreme Court has stated that all the First Amendment rights are cut from the same cloth, McDonald v Smith, supra at 482, the clauses are nonetheless distinct in their natures.[7] The First Amendment provides:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.
Inasmuch as the First Amendment protects the “freedom of speech,” the word “speech” has often been dissected in order to determine what constitutes speech. In this pursuit, the United States Supreme Court has often focused on the subject of the speech. See, e.g., Miller v California, 413 US 15; 93 S Ct 2607; 37 L Ed 2d 419 (1973) (obscenity); Virginia State Bd of Pharmacy v Virginia Citizens Consumer Council, Inc, 425 US 748; 96 S Ct 1817; 48 L Ed 2d 346 (1976) *750 (commercial speech); Chaplinsky v New Hampshire, 315 US 568; 62 S Ct 766; 86 L Ed 1031 (1942) (fighting words); RAV v City of St Paul, 505 US 377; 112 S Ct 2538; 120 L Ed 2d 305 (1992) (hate speech). In fact, case law on freedom of speech has developed a bifurcated analysis differentiating whether contested regulations on expression are “content-neutral” or “content-based.” See, e.g., Tribe, American Constitutional Law (2d ed), § 12-2, pp 791-792.
However, while the text of the Free Speech Clause fairly invites an analytical focus on the subject of speech, the text of the Petition Clause, the right “to petition,” denotes a focus not on the identity of the speaker or subject matter, but the identity of the listener. The text of the First Amendment accordingly implies that where the government is the listener, the speaker’s right to petition the government is at issue.
This textual distinction is not, in my opinion, without significance. Rather, it signals the original intent of the Petition Clause to protect citizen input when presented in the form of a petition to government, regardless whether it would be considered “speech” or “press” under the sibling clauses of the First Amendment.
3. POST-1791 DEVELOPMENT
While petitioning in colonial America afforded even the disenfranchised access to the People’s representatives, petitioning eventually atrophied as a popular tool of self-governance at the center of our republican form of government with the increased emphasis on voting and the expansion of rights of enfranchisement *751 in the United States.[8] Mark, supra at 2154, 2158-2160. Because petitioning itself has receded in its political prominence, it is not hard to understand why, especially with the enormous expansion of protections now accorded under the Free Speech Clause and the Free Press Clause during the last century, the Petition Clause has lacked apparent independent political importance in constitutional adjudication. Despite what I believe is a compelling historical and textual case for according the Petition Clause distinctive meaning,[9] by the twentieth century, the federal judiciary had all but relegated the Petition Clause to the status of a step-sibling without independent identity or import apart from the Free Speech Clause and the Free Press Clause of the First Amendment. Our contemporary Petition Clause jurisprudence is thus entirely anchored in that developed under the other First Amendment clauses. See, e.g., McDonald, supra.
4. RESOLUTION
Although I would adhere to the principle that a constitutional provision is to be interpreted consist *752 ently with its original understanding,[10] I acknowledge that our obligation is to follow the United States Supreme Court’s interpretation of this constitutional provision. In light of the Court’s holding that absolute immunity from defamation does not exist for petition activity in McDonald, I accept as I must the analysis offered in my majority opinion.
However, I believe the history and text of the petition right, as analyzed above, support an interpretation that the Petition Clause is distinct from its First Amendment siblings and therefore deserves consideration regarding whether distinct treatment in the constitutional law of defamation is warranted under the Petition Clause. For this reason, I believe McDonald was incorrectly decided.
II. APPLICATION OF THE MCDONALD PRINCIPLE
While I concur in the majority opinion because of the clear direction provided by McDonald, in addition to my original-intent analysis, I believe there are meritorious arguments for declining to extend the private-figure and public-figure defamation distinction to cases involving the right to petition. Further, the flaw *753 of the McDonald principle that the First Amendment clauses are to be treated without distinction in defamation cases is exposed, in my opinion, by the extension of the private-figure and public-figure dichotomy to petition-right cases — particularly the present case.
The rationale for the private-figure and public-figure dichotomy announced in Gertz v Robert Welch, Inc, 418 US 323; 94 S Ct 2997; 41 L Ed 2d 789 (1974), seems potentially misplaced in petition settings where the alleged defamation damages derive from the resulting actions of the government. Gertz reasoned that private individuals are more vulnerable to defamation than public figures because public figures have “significantly greater access” to the media and can use the media to counteract false statements. Gertz, supra at 344.[11]
It is arguable that the Gertz “access to the media” rationale in the free speech and free press contexts is ill-fitted to the right to petition context, particularly where a plaintiffs damages are a product of the adverse actions of government, albeit induced by a third party. Unlike falsehoods disseminated by or in *754 the media, access to city council meetings is not similarly limited. City council meetings are generally not run so that only public figures can be heard and private figures ignored. A central purpose of a public meeting of the city council is to allow citizenry input and to maximize the exposure of the government’s decision-making in an open meeting.
In fact, the access to respond to defamatory statements in a petition context is evident in the present case, where plaintiff was given the opportunity at the city council meeting to answer defendant’s assertions. Further, the Petition Clause itself protected plaintiff’s right to deliver a written petition to the city council in order to answer the defamatory statements made by defendant. For these reasons, it is questionable whether the rationale for the private-figure and public-figure dichotomy announced in Gertz, and applied in defamation actions involving freedom of speech or freedom of the press, provides a solid foundation for the private-figure and public-figure standard in the right to petition context. This extension is particularly questionable where the damages are a result of a decision made by the listener, a city council, to which both plaintiff and defendant have constitutionally guaranteed access under the Petition Clause.
III. CONCLUSION
An analysis of the original understanding of the Petition Clause leads to the conclusion that McDonald was incorrectly decided. Consistent with its preratification history and its text, I believe that the Petition Clause offers protections distinct from its sibling clauses under the First Amendment and that the *755 defendant union representative’s statements were absolutely immune from defamation liability.
However, McDonald provides this Court with clear direction about whether the private-figure and public-figure dichotomy of free speech and free press defamation law is to be extended to petition right defamation cases. As this Court is bound by McDonald because of the Supremacy Clause of the United States Constitution,[12]1 reluctantly but obediently agree with the analysis set forth in my majority opinion.

 Although I realize that the Supreme Court in White v Nichols, 44 US (3 How) 266, 289; 11 L Ed 591 (1845), labeled Lake “anomalous” and inconsistent with “modern adjudications,” I note that constitutional interpretation inquiries are directed at the original understanding of a provision. Accordingly, that Lake proved to be inconsistent with post-1791 adjudications should be of no consequence where there is no record of Lake's vitality being questioned before 1791. Nor does the absence of any pre-1791 challenge to Lake warrant that its rule of law be considered “anomalous.” This is particularly evident where subsequent events can be *739 relied on as an indication that Lake was considered sound. See the discussion below regarding The Case of the Seven Bishops, 12 Howell’s State Trials 183 (1688), and the establishment of the English Bill of Rights.

 Defense counsel in Seven Bishops proclaimed to the Court that the dispute was “a case of the greatest consequence that ever was in Westminster-hall ... or in this court.” Seven Bishops, supra at 239.

 While there existed a few qualifications on the form and manner of presentation of petitions that were unique to individual colonial states, none addressed defamation. Several colonies and states required that a petition be submitted in an “orderly and peaceable manner.” Smith, supra at 1181-1182. This requirement was consistent with statutory requirements that accompanied the English Bill of Rights, but it did not concern the content of the petition.

 At least in colonial Virginia, the right to petition was not limited by class, sex, or race. Bailey, supra at 43. In fact, Bailey documents that after the Virginia legislature was given authority over the manumission of slaves in 1776, petitions increased from blacks both free and enslaved. Id. at 44.

 “The Migration or Importation of such Persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thousand eight hundred and eight, but a Tax or duty may be imposed on such Importation, not exceeding ten dollars for each Person.” US Const, ait I, § 9, cl 1.

 A good deal of the congressional time and activity was devoted to the debate on the Quaker petitions, with veiled threats of secession made by southern members of Congress if any aspect of slave practices were disturbed by the federal legislature. Ellis, supra. Eventually, by resolution, the 1st Congress adopted an amended recommendation of the committee formed to consider the Quaker petitions. Ellis, supra at 118 (citing De Pauw, 3 Documentary History of the First Federal Congress of the United States [Baltimore: John Hopkins Univ Press, 1972], p 341). That resolution forbade not only congressional consideration of the issue of slavery until 1808, but banned its consideration forever. Ellis, supra at 118.

 At the least, the presentation of the Petition Clause as one separate from the clauses concerning freedom of speech in the First Amendment alerts us textually that the purpose and intent of the Petition Clause must be distinct from its sibling clauses. Higginson, A short history of the right to petition government for the redress of grievances, 96 Yale L J 142, 155-156 (1986). Further, I note that whereas the Free Speech Clause and the Free Press Clause are separated by a comma, both are separated from the Petition Clause by a semi-colon. See Kesavan & Paulsen, Is West Virginia constitutional?, 90 Cal L R 291, 334-352 (2002) (discussing, inter alia, the interpretation of the sixty-five semi-colons contained in the original constitution, particularly the punctuation of US Const, art IV, § 3 concerning the creation of new states).

 See, e.g., the Fifteenth, Nineteenth, and Twenty-Sixth Amendments, which extended the right to vote to individuals regardless of race, color, or previous servitude and to women and citizens eighteen years old and older.

 Further, it seems illogical that the founders, wary of an overpowering and unaccountable federal government, would create immunity from defamation for governmental actors under the Speech and Debate Clause, US Const, art I, § 6, cl 1, but expose the People to defamation when petitioning. Barr v Mateo, 360 US 564; 79 S Ct 1335; 3 L Ed 2d 1434 (1959). Consider a mutually libelous exchange between a citizen and a congressman at a congressional hearing. While the congressman would be absolutely immune from liability because of the Speech and Debate Clause, under McDonald’s inteipretation of the Petition Clause, the citizen would face potential liability. Such an outcome seems incompatible with the founders’ understood view that the People are the masters and the government the servant.

 While I acknowledge that contemporary, postratification judicial interpretations of a constitutional provision could permissibly aid an effort to determine the original intent of a provision, I suggest that such consideration is misplaced where the original intent can be surmised from the preratification understanding of the provision’s meaning. Inasmuch as McDonald essentially ignores the preratification understanding of the petition right, I find its concentration on the postratification case law insufficient and unjustified. Schnapper, supra (stating that McDonald fails “to discuss any seventeenth-or eighteenth-century materials that might reveal the contemporaneous understanding of the petition clause, but relies instead solely on postratification materials,” id. at 305, and concluding that “[h]ad McDonald written his letter ... to President Washington or to George III, rather than to President Reagan, a libel action by Smith would have been dismissed out of hand,” id. at 343).

 I recognize that Gertz also opined that public figures deserve less protection against defamation because they have “voluntarily exposed themselves to increased risk of iiy'ury from defamatory falsehood[s],” Gertz, supra at 345, unlike private persons. While this reasoning would appear to provide an alternative Gerfe-based avenue for extending the private-figure and public-figure dichotomy to the Petition Clause, I suggest that this rationale is also perhaps misplaced in a petition setting like the present one.
Although it is well established in the case law on freedoms of speech and press that a private figure who throws himself into a public dispute can become a limited purpose public figure for defamation qualified immunity purposes, Gertz, supra at 351, plaintiff in this case petitioned the city council to award him a public contract. It appears questionable to me that one who invites comment from his fellow citizens by petitioning the government on a public issue, seeking the fruits of a taxpayer-funded construction project, remains a private figure.

 US Const, art VI, cl 2.