# McDONALD *v.* SMITH

No. 84–476.   Argued March 20, 1985—Decided June 19, 1985

BURGER, C. J., delivered the opinion of the Court, in which all other Members joined, except POWELL, J., who took no part in the decision of the case. BRENNAN, J., filed a concurring opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 485.

*Bruce J. Ennis, Jr.*, argued the cause for petitioner. With him on the brief were *Paul R. Friedman* and *Geoffrey P. Miller*.

*William A. Eagles* argued the cause for respondent. With him on the brief was *B. F. Wood*.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether the Petition Clause of the First Amendment provides absolute immunity to a defendant charged with expressing libelous and damaging falsehoods in letters to the President of the United States.

I

In July 1981, respondent commenced a libel action against petitioner in state court under the common law of North Carolina. Respondent alleged that while he was being considered for the position of United States Attorney, petitioner

---

*\*Charles S. Sims* filed a brief for the American Civil Liberties Union as *amicus curiae* urging reversal.

wrote two letters to President Reagan.[1] The complaint alleges that these letters "contained false, slanderous, libelous, inflammatory and derogatory statements" concerning respondent. App. 4–5. In particular, the complaint states that the letters falsely accused respondent of "violating the civil rights of various individuals while a Superior Court Judge," "fraud and conspiracy to commit fraud," "extortion or blackmail," and "violations of professional ethics." *Id.*, at 5–6. Respondent alleged that petitioner knew that these accusations were false, and that petitioner maliciously intended to injure respondent by undermining his prospect of being appointed United States Attorney.

The complaint alleges that petitioner mailed copies of the letters to Presidential Adviser Edwin Meese, Senator Jesse Helms, Representative W. E. Johnston, and three other officials in the Executive and Legislative Branches.[2] It further alleges that petitioner's letters had their intended effect: respondent was not appointed United States Attorney, his reputation and career as an attorney were injured, and he "suffered humiliation, embarrassment, anxiety and mental anguish." *Id.*, at 6. Respondent sought compensatory and punitive damages of $1 million.

Petitioner removed the case to the United States District Court on the basis of diversity of citizenship. He then moved for judgment on the pleadings on the ground that the Petition Clause of the First Amendment provides absolute

---

[1] The first letter, dated December 1, 1980, was written to Ronald Reagan as "President-Elect of the United States." App. 8. The second letter was dated February 13, 1981, and directed to President Reagan. *Id.*, at 14. Petitioner described himself as a "politically active American" who has owned and operated three child-care centers in North Carolina since 1970. *Id.*, at 8.

[2] Copies of the December 1, 1980, letter were purportedly sent to Representatives Jack Kemp and Barry Goldwater, Jr. The Director of the Federal Bureau of Investigation, William Webster, allegedly received a copy of the letter dated February 13, 1981.

immunity. The District Court agreed with petitioner that his communications fell "within the general protection afforded by the petition clause," 562 F. Supp. 829, 838–839 (MDNC 1983), but held that the Clause does not grant absolute immunity from liability for libel. The Fourth Circuit, relying on this Court's decision in *White* v. *Nicholls*, 3 How. 266 (1845), affirmed.[3] 737 F. 2d 427 (1984).

We granted certiorari, 469 U. S. 1032 (1984), and we affirm.

## II

The First Amendment guarantees "the right of the people . . . to petition the Government for a redress of grievances." The right to petition is cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression. In *United States* v. *Cruikshank*, 92 U. S. 542 (1876), the Court declared that this right is implicit in "[t]he very idea of government, republican in form." *Id.*, at 552. And James Madison made clear in the congressional debate on the proposed amendment that people "may communicate their will" through direct petitions to the legislature and government officials. 1 Annals of Cong. 738 (1789).

The historical roots of the Petition Clause long antedate the Constitution. In 1689, the Bill of Rights exacted of William and Mary stated: "[I]t is the Right of the Subjects to petition the King." 1 Wm. & Mary, Sess. 2, ch. 2. This idea reappeared in the Colonies when the Stamp Act Congress of 1765 included a right to petition the King and Parliament in its Declaration of Rights and Grievances. See 1 B. Schwartz, The Bill of Rights—A Documentary History 198 (1971). And the Declarations of Rights enacted by many

---

[3] Because petitioner raised a "serious and unsettled question" concerning absolute immunity, 737 F. 2d, at 428, the Court of Appeals accepted jurisdiction under the "collateral order" doctrine. See *Nixon* v. *Fitzgerald*, 457 U. S. 731, 742–743 (1982). Given the preliminary nature of this petition for certiorari, we do not address petitioner's request for attorney's fees should he ultimately prevail.

state conventions contained a right to petition for redress of grievances. See, *e. g.*, Pennsylvania Declaration of Rights (1776).

Although the values in the right of petition as an important aspect of self-government are beyond question, it does not follow that the Framers of the First Amendment believed that the Petition Clause provided absolute immunity from damages for libel. Early libel cases in state courts provide no clear evidence of the nature of the right to petition as it existed at the time the First Amendment was adopted; these cases reveal conflicting views of the privilege afforded expressions in petitions to government officials.

The plaintiff in the Vermont case of *Harris* v. *Huntington*, 2 Tyler 129 (1802), brought a libel action complaining of the defendant's petition to the legislature that he not be reappointed as a justice of the peace. The court, based on its understanding of "the right of petitioning the supreme power," granted the defendant's request for an "absolute and unqualified immunity from all responsibility." *Id.*, at 139–140. This absolute position of the Vermont court reflected an early English view,[4] but was not followed by the courts of other States. See, *e. g.*, *Commonwealth* v. *Clapp*, 4 Mass. 163, 169 (1808). Indeed, Justice Yeates of the Supreme Court of Pennsylvania stated in *Gray* v. *Pentland*, 2 Serg. & R. 23 (1815), that

"an individual, who *maliciously, wantonly,* and *without probable cause,* asperses the character of a public officer in a written or printed paper, delivered to those who are invested with the power of removing him from office, is responsible to the party injured in damages, although such paper is masked under the specious cover of investigating the conduct of such officer for the general good. Public policy demands no such sacrifice of the rights of

---

[4] See *Lake* v. *King*, 1 Wms. Saund. 131, 85 Eng. Rep. 137 (K. B. 1680). In *White* v. *Nicholls*, 3 How. 266, 289 (1845), this Court described *Lake* v. *King* as a "seemingly anomalous decision."

persons in an official capacity, nor will the law endure such a mockery of its justice." *Id.*, at 25 (emphasis in original).

In *White* v. *Nicholls, supra,* this Court dealt with the proper common-law privilege for petitions to the Government. The plaintiff in *White* brought a libel action based on letters written by Nicholls urging the President of the United States to remove the plaintiff from office as a customs inspector. The Court, after reviewing the common law, concluded that the defendant's petition was actionable if prompted by "express malice," which was defined as "falsehood and the absence of probable cause." *Id.*, at 291. Nothing presented to us suggests that the Court's decision not to recognize an absolute privilege in 1845 should be altered; we are not prepared to conclude, 140 years later, that the Framers of the First Amendment understood the right to petition to include an unqualified right to express damaging falsehoods in exercise of that right.[5]

Nor do the Court's decisions interpreting the Petition Clause in contexts other than defamation indicate that the right to petition is absolute. For example, filing a complaint in court is a form of petitioning activity; but "baseless litigation is not immunized by the First Amendment right to petition." *Bill Johnson's Restaurants, Inc.* v. *NLRB*, 461 U. S. 731, 743 (1983); accord, *California Motor Transport Co.* v. *Trucking Unlimited*, 404 U. S. 508, 513 (1972). Similarly, petitions to the President that contain intentional and reckless falsehoods "do not enjoy constitutional protection," *Garrison* v. *Louisiana*, 379 U. S. 64, 75 (1964), and may, as in *White* v. *Nicholls, supra,* be reached by the law of libel.

---

[5] Basic aspects of the right to petition were under attack in England in the 1790's. In response to an assembly of 150,000 persons petitioning for various reforms, Parliament outlawed public meetings of more than 50 persons held to petition the King, "except in the presence of a magistrate with authority to arrest everybody present." I. Brant, The Bill of Rights 245 (1965).

To accept petitioner's claim of absolute immunity would elevate the Petition Clause to special First Amendment status. The Petition Clause, however, was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble. See *Mine Workers* v. *Illinois Bar Assn.*, 389 U. S. 217, 222 (1967). These First Amendment rights are inseparable, *Thomas* v. *Collins*, 323 U. S. 516, 530 (1945), and there is no sound basis for granting greater constitutional protection to statements made in a petition to the President than other First Amendment expressions.

### III

Under state common law, damages may be recovered only if petitioner is shown to have acted with malice; "malice" has been defined by the Court of Appeals of North Carolina, in terms that court considered consistent with *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), as "knowledge at the time that the words are false, or . . . without probable cause or without checking for truth by the means at hand." *Dellinger* v. *Belk*, 34 N. C. App. 488, 490, 238 S. E. 2d 788, 789 (1977). We hold that the Petition Clause does not require the State to expand this privilege into an absolute one. The right to petition is guaranteed; the right to commit libel with impunity is not. The judgment of the Court of Appeals is therefore

*Affirmed.*

JUSTICE POWELL took no part in the decision of this case.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring.

*New York Times Co.* v. *Sullivan*, 376 U. S. 254, 279–280 (1964), held that a public official may recover damages for a false statement concerning his official conduct only where the statement was "made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." This standard, explicitly di-

rected toward protection of "freedom of speech and of the press," *id.*, at 264, reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *id.*, at 270.

The petitioner Robert McDonald contends that when a citizen communicates directly with Government officials about matters of public importance—here the qualifications of a candidate for United States Attorney—the First Amendment's Petition Clause requires courts in defamation actions to accord an *absolute* privilege to such communications rather than the qualified privilege defined in *New York Times.* I fully agree with the Court that the Petition Clause imposes no such absolute privilege.

McDonald correctly notes that the right to petition the Government requires stringent protection. "The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." *United States* v. *Cruikshank,* 92 U. S. 542, 552 (1876). The right to petition is "among the most precious of the liberties guaranteed by the Bill of Rights," *Mine Workers* v. *Illinois Bar Assn.,* 389 U. S. 217, 222 (1967), and except in the most extreme circumstances citizens cannot be punished for exercising this right "without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions," *De Jonge* v. *Oregon,* 299 U. S. 353, 364 (1937). As with the freedoms of speech and press, exercise of the right to petition "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," and the occasionally "erroneous statement is inevitable." *New York Times Co.* v. *Sullivan, supra,* at 270–271. The First Amendment requires that we extend substantial " 'breathing space' " to such expression, because a rule imposing liability whenever a statement was accidently or negligently incorrect would

intolerably chill "would-be critics of official conduct . . . from voicing their criticism." 376 U. S., at 272, 279.[1]

We have not interpreted the First Amendment, however, as requiring protection of *all* statements concerning public officials.

> "Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity. At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even to topple an administration. . . . That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . .' *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 572. Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection." *Garrison* v. *Louisiana*, 379 U. S. 64, 75 (1964).

---

[1] To safeguard the First Amendment's values, "defeasance of the privilege" set forth in *New York Times* "is conditioned, not on mere negligence, but on reckless disregard for the truth." *Garrison* v. *Louisiana*, 379 U. S. 64, 79 (1964).

McDonald argues that, for two reasons, this qualification of the right vigorously to criticize public officials should not apply to expression falling within the scope of the Petition Clause.[2]  First, he contends that petitioning historically was accorded an absolute immunity and that the Framers included the Petition Clause in the First Amendment on this understanding.  I agree with the Court that the evidence concerning 17th- and 18th-century British and colonial practice reveals, at most, "conflicting views of the privilege afforded expressions in petitions to government officials," *ante*, at 483, and does not persuasively demonstrate the Framers' intent to accord absolute immunity to petitioning.

Second, McDonald argues that criticism of public officials under the Petition Clause is functionally different from, and therefore entitled to greater protection than, criticism of officials falling within the protection of the First Amendment's Speech and Press Clauses.  Specifically, he contends that *"[u]nlike the more general freedoms of speech and press,* the right to petition was understood by the Framers of the Constitution and the First Amendment to be a necessary right of a self-governing people," and that "when the citizen is not speaking to the public at large, but is directly

---

[2] For purposes of applying an absolute immunity in the Petition Clause context, McDonald suggests that we need consider only those expressions that "touc[h] on" and are "relevant to" the official conduct of public servants, and that are "contained in a private petition to federal officials who [have] authority to take responsive actions."  Brief for Petitioner 7, and n. 7.  The Court long ago concluded, however, that the Petition Clause embraces a much broader range of communications addressed to the executive, the legislature, courts, and administrative agencies.  See, *e. g., Bill Johnson's Restaurants, Inc.* v. *NLRB*, 461 U. S. 731, 741 (1983); *California Motor Transport Co.* v. *Trucking Unlimited*, 404 U. S. 508, 510 (1972).  It also includes such activities as peaceful protest demonstrations.  See, *e. g., NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 909–912 (1982); *Edwards* v. *South Carolina*, 372 U. S. 229, 235 (1963).  Expression falling within the Petition Clause will thus frequently also be protected by the First Amendment freedoms of speech, press, and assembly.  See also *Adderley* v. *Florida*, 385 U. S. 39, 49–51 (1966) (Douglas, J., dissenting).

exercising his right to petition, [he] is thus performing a self-governmental function." Brief for Petitioner 7, 30 (emphasis added). Such a distinction is untenable. The Speech and Press Clauses, every bit as much as the Petition Clause, were included in the First Amendment to ensure the growth and preservation of democratic self-governance. A citizen who criticizes a public official is shielded by the Speech and Press Clauses because "[i]t is as much his *duty* to criticize as it is the official's duty to administer." *New York Times Co.* v. *Sullivan*, 376 U. S., at 282 (emphasis added). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison* v. *Louisiana, supra,* at 74–75.[3]

The Framers envisioned the rights of speech, press, assembly, and petitioning as interrelated components of the public's exercise of its sovereign authority. As Representative James Madison observed during the House of Representatives' consideration of the First Amendment:

"The right of freedom of speech is secured; the liberty of the press is expressly declared to be beyond the reach of this Government; the people may therefore publicly address their representatives, may privately advise them, or declare their sentiments by petition to the whole body; *in all these ways they may communicate their will.*" 1 Annals of Cong. 738 (1789) (emphasis added).

The Court previously has emphasized the essential unity of the First Amendment's guarantees:

"It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single

---

[3] Thus the advertisement at issue in *New York Times*, every bit as much as the letter to President Reagan at issue here, "communicated information, expressed opinion, recited grievances, [and] protested claimed abuses"—expression essential " 'to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means.' " *New York Times Co.* v. *Sullivan*, 376 U. S., at 266, 269.

guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable. They are cognate rights, . . . and therefore are united in the First Article's assurance." *Thomas* v. *Collins*, 323 U. S. 516, 530 (1945).

And although we have not previously addressed the precise issue before us today, we have recurrently treated the right to petition similarly to, and frequently as overlapping with, the First Amendment's other guarantees of free expression. See, *e. g.*, *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 909–912, 915 (1982); *Mine Workers* v. *Illinois Bar Assn.*, 389 U. S., at 221–222; *Adderley* v. *Florida*, 385 U. S. 39, 40–42 (1966); *Edwards* v. *South Carolina*, 372 U. S. 229, 234–235 (1963); *NAACP* v. *Button*, 371 U. S. 415, 429–431 (1963).

There is no persuasive reason for according greater or lesser protection to expression on matters of public importance depending on whether the expression consists of speaking to neighbors across the backyard fence, publishing an editorial in the local newspaper, or sending a letter to the President of the United States. It necessarily follows that expression falling within the scope of the Petition Clause, while fully protected by the actual-malice standard set forth in *New York Times Co.* v. *Sullivan*, is not shielded by an absolute privilege. I therefore join the Court's opinion.