TOM MYERS, Plaintiff-Appellant, v. NELSON LEVY, Defendant-Appellee.

Second District    No. 2—02—1334

Opinion filed April 27, 2004.

William R. Coulson and Arthur S. Gold, both of Gold & Coulson, of Chicago, for appellant.

Daniel P. Field, of Scariano, Himes & Petrarca, Chtrd. of Waukegan, for appellee.

JUSTICE BYRNE delivered the opinion of the court:

Plaintiff, Tom Myers, alleges that defendant, Nelson Levy, caused his termination as the varsity football coach at Lake Forest High School (the school). On March 30, 2001, plaintiff filed a three-count amended complaint for "defamation, false light, and tortious interference with prospective economic advantage or business opportunity." The trial court granted defendant summary judgment on each of the three counts, and plaintiff appeals. We affirm in part, reverse in part, and remand the cause for further proceedings.

## FACTS

Plaintiff's amended complaint alleges that he was fired as football

coach on January 25, 2001, but continues to serve as a teacher and the head varsity baseball coach at the school. Plaintiff graduated from the school in 1966 and has lived in Lake Forest for 34 years. The complaint recites plaintiff's experience as a college athlete and high school coach. Two of defendant's sons had participated on plaintiff's football teams and graduated from the school. Defendant's third son was a student athlete at the school at the time plaintiff was removed as football coach. Plaintiff alleges that defendant's conduct was motivated by his son's competition with plaintiff's son for the team's quarterback position.

Plaintiff alleges that, on October 16, 2000, defendant communicated several written defamatory statements to "others." The statements were contained in a letter addressed to Dr. Jonathan Lamberson, the school superintendent and principal, and Jill Bruder, the athletic director. Defendant recommended removing plaintiff as head football coach. The amended complaint alleges, and defendant concedes, that the correspondence included the following statements:

"a. [Plaintiff] shows little or no concern for players who are injured.

b. When a player is injured, [plaintiff] rarely, if ever calls and never visits, sends a get well card or in any other way expresses concern.

c. [Plaintiff] lacks true concern for the young men who devote so much of themselves to his program.

d. [Plaintiff] lacks the respect as a coach of virtually all of his players[;] *** they have no confidence in [plaintiff] as a leader or a motivator. Sadly they consider him a joke to be worked around, not with.

e. [Plaintiff] sets a very poor example for his coaches and players.

f. As poor as he is as a coach and leader of coaches, much more distressing is [plaintiff's] abysmal failure to support his players.

g. When the team loses, [plaintiff] and some of his assistants make the kids feel like they did not try hard enough.

h. Such is sad, despicable and inexcusable treatment of the group of boys who play their hearts out and are denied the chance to win by the buffoons that direct the action.

i. [Plaintiff] and his program fail miserably.

j. [Plaintiff sets] a poor example as a teacher, who consistently hired poor quality subordinates.

k. [Plaintiff] cared little or nothing about the well[-]being of his students *** [and] commanded the respect of neither his peers nor his pupils.

l. [Plaintiff] is *** grossly unprepared.

m. [Plaintiff] fails as an educator and a leader."

On November 8, 2000, defendant sent Lamberson a petition letter calling for plaintiff's dismissal as football coach. The correspondence was accompanied by a list of football parents who purportedly agreed with and signed the letter. The envelope and the bottom of each page of the list were labeled "CONFIDENTIAL TO BE VIEWED BY DR. LAMBERSON ONLY." Defendant allegedly misrepresented the number of signatures he collected and falsely reported that several parents had signed the petition. The record contains written statements signed by six football parents, including one circuit court judge, in which each confirms that defendant falsely reported that he or she signed the petition. In the November 8, 2000, communication to Lamberson, defendant stated that he had spent three years lobbying Bruder and the former superintendent for plaintiff's removal as football coach. The complaint alleges that defendant's earlier public praise of plaintiff proves that he was not, in fact, dissatisfied with him.

Bruder recommended, Lamberson authorized, and the school board officially approved plaintiff's removal as head football coach on January 25, 2001. On the next day, the *Chicago Sun-Times* published two statements attributed to defendant. Defendant stated that "[t]here has been a consistent unhappiness, widespread discontent, with [plaintiff] as football coach for more than a decade." Defendant also stated, "I was probably the number one antagonist of an organized effort that involved hundreds of people. The thrust was not wins or losses, but rather that the kids don't respect him." On February 25, 2001, the *Chicago Tribune* published a third quotation in which defendant stated, "[y]ou've had an incompetent coach in place for a decade who used to be a good coach."

The record contains a letter addressed to a group of Lake Forest eighth-grade student athletes in which defendant praised plaintiff in the fall of 1997. The letter states, "Our community has a great coaching role model in [plaintiff]. [Plaintiff] makes every kid on his team feel good about himself. He is a personal role model for character, kindness, and fairness. His players grow from within, not from being bombarded by constant coaching demands. [Plaintiff] builds teams of self-confident kids who are not afraid to make a mistake. And, almost every year, [plaintiff] takes a bunch of under-sized, slow boys into the state play-offs." In early 1998, defendant wrote a fiftieth birthday tribute to plaintiff in which defendant again praised plaintiff for his exceptional and compassionate coaching.

The defamation count alleges that defendant's subsequent derogatory statements "injured [plaintiff's] reputation in the community, were false, were malicious, and made with a reckless disregard for

their truth. These statements constitute libel and slander *per se*, and also caused or contributed to cause [plaintiff] to be removed as head varsity football coach at [the school], a position he dearly loved." Plaintiff earned an additional $7,500 annual salary at the time he was removed from the coaching position.

The false light invasion of privacy count alleges that defendant's newspaper quotations "placed [plaintiff] in a false light as same would be considered highly offensive by a reasonable person." Defendant allegedly had knowledge of the falsity of the statements or acted in reckless disregard as to their truth or falsity and the false light in which plaintiff would be placed upon publication of the statements.

The count for tortious interference with prospective economic advantage alleges that defendant knew of and interfered with plaintiff's economic advantage or business opportunity to continue as head football coach. Defendant's interference allegedly caused or contributed to cause plaintiff's removal. Each of the three counts included a prayer for $50,000 in compensatory damages and $1 million in punitive damages.

Defendant moved to dismiss the amended complaint, and the trial court denied the motion on November 1, 2001. Following the hearing, the trial court found that plaintiff is a public figure for purposes of the litigation.

Defendant subsequently filed a motion for summary judgment, in which he alleged that plaintiff could never prove that defendant acted with actual malice because 42 football parents provided defendant with statements similar to his own. Defendant argued that plaintiff's claims lack merit because the statements were true and because defendant did not act with reckless disregard as to their truth or falsity. Defendant quoted deposition testimony in which plaintiff acknowledged that defendant sincerely believed that each of the allegedly defamatory statements was true. Defendant's motion also included the deposition testimony of Bruder and Lamberson. Lamberson testified that the decision to remove plaintiff as head football coach "had nothing to do with parental pressure." Bruder similarly testified that "the failure to renew [plaintiff's] contract as the head football coach at Lake Forest High School for the year 2001 had absolutely nothing to do with the activities of [defendant]." Bruder stated that plaintiff was removed because summertime scheduling conflicts precluded him from serving as the head coach of both the football and baseball teams. At the hearing on the summary judgment motion, the parties essentially debated the truth of defendant's statements regarding plaintiff's performance as the head football coach. Plaintiff also argued that the issue of whether defendant acted with

actual malice was a jury question that could not be resolved on a summary judgment motion.

The trial court granted defendant summary judgment, concluding that defendant's statements were privileged because he directed them toward the school, a governmental body. The court further concluded that defendant did not act with actual malice because he sincerely believed the veracity of the statements. Finally, the court emphasized Lamberson's testimony that defendant's petition did not influence the decision to remove plaintiff as coach. Plaintiff appeals from the November 1, 2001, finding that he is a public figure and from the November 18, 2002, order granting defendant summary judgment on all three counts.

## ANALYSIS

On appeal, plaintiff argues that defendant should not have been granted summary judgment because plaintiff is not a public figure and defendant abused a qualified privilege in working toward the removal of plaintiff as the football coach. Plaintiff contends that an issue of material fact exists that precluded the trial court from granting summary judgment. In all appeals from the entry of summary judgment, we conduct a *de novo* review of the evidence in the record. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113 (1995). Summary judgment is appropriate where the pleadings, affidavits, depositions, and admissions on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2000); *Bier v. Leanna Lakeside Property Ass'n*, 305 Ill. App. 3d 45, 50 (1999). "Summary judgment is a drastic means of resolving litigation and should be allowed only when the right of the moving party is clear and free from doubt." *Bier*, 305 Ill. App. 3d at 50. "Therefore, where reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact." *Espinoza*, 165 Ill. 2d at 114. If a party moving for summary judgment introduces facts which, if not contradicted, would entitle him to a judgment as a matter of law, the opposing party may not rely on his pleadings alone to raise issues of material fact. *Hermes v. Fischer*, 226 Ill. App. 3d 820, 824 (1992).

### 1. Defamation and False Light Invasion of Privacy

A statement is considered defamatory if it tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating

with him. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 87 (1996). "To make out a claim for defamation, the plaintiff must set out sufficient facts to show that the defendants made a false statement concerning him, that there was an *unprivileged publication* to a third party with fault by the defendant, which caused damage to the plaintiff." (Emphasis added.) *Krasinski v. United Parcel Service, Inc.*, 124 Ill. 2d 483, 490 (1988). Defamatory statements may be actionable *per se* or actionable *per quod*. A publication is defamatory *per se* if it is so obviously and naturally harmful to the person to whom it refers that a showing of special damages is unnecessary and extrinsic facts are not needed to explain it. *Dubinsky v. United Airlines Master Executive Council*, 303 Ill. App. 3d 317, 323 (1999). A claim for defamation *per quod* requires the plaintiff to allege both extrinsic facts to establish that the statement is defamatory and special damages with particularity. *Dubinsky*, 303 Ill. App. 3d at 323. Plaintiff argues that defendant's statements were defamatory *per se*.

■ Illinois courts have recognized four categories of statements that are considered defamatory *per se*: (1) words that impute the commission of a crime; (2) words that impute infection with a loathsome communicable disease; (3) words that impute an inability to perform or a want of integrity in the discharge of duties of office or employment; or (4) words that prejudice a party, or impute lack of ability, in his or her trade, profession, or business. *Dubinsky*, 303 Ill. App. 3d at 323. Defendant does not dispute that his statements fall under the third and fourth categories of statements that are defamatory *per se*; however, he contends that they were conditionally privileged.

■ In *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16, 27 (1993), our supreme court adopted the Restatement (Second) of Torts approach to determine whether a qualified privilege applies in a given defamation case. *Gist v. Macon County Sheriff's Department*, 284 Ill. App. 3d 367, 372 (1996), citing Restatement (Second) of Torts §§ 593 through 599 (1977). The three types of situations in which a conditional privilege exists are (1) situations that involve some interest of the person who publishes the defamatory matter; (2) situations that involve some interest of the person to whom the matter is published or of some third person; and (3) situations that involve a recognized interest of the public. *Gist*, 284 Ill. App. 3d at 372-73. A court should examine the occasion giving rise to the defamation action when determining as a matter of public policy whether the occasion created some recognized duty or interest that makes communication of the defamatory statement in that situation conditionally privileged as a matter of law. *Gist*, 284 Ill. App. 3d at 373.

■ If a defendant demonstrates the existence of a qualified privilege, the burden then shifts to the plaintiff to demonstrate an abuse of the privilege. The qualified privilege is abused if (1) the defendant acted with actual malice by making the statement with knowledge of its falsity or acting in reckless disregard as to the truth or falsity of the statement; or (2) the defendant committed " 'any reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties.' " *Gist*, 284 Ill. App. 3d at 374, quoting *Kuwik*, 156 Ill. 2d at 30.

■ The plaintiff need prove the common-law elements of defamation only by a preponderance of the evidence, but when the defendant establishes the existence of a qualified privilege, the plaintiff must prove by clear and convincing evidence that the defendant acted with actual malice. *Martin v. State Journal-Register*, 244 Ill. App. 3d 955, 962 (1993). The trial court implements these standards when a party moves for summary judgment on a defamation claim. *Martin*, 244 Ill. App. 3d at 962, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 91 L. Ed. 2d 202, 215, 106 S. Ct. 2505, 2513 (1986).

■ In *Lovgren v. Citizens First National Bank of Princeton*, 126 Ill. 2d 411 (1989), our supreme court set forth the three elements necessary to state a cause of action for false light invasion of privacy. First, the allegations in the complaint must show that the plaintiff was placed in a false light before the public as a result of the defendant's actions. Second, the court must determine whether a trier of fact could decide that the false light in which the plaintiff was placed would be highly offensive to a reasonable person. Third, the plaintiff must allege and prove that the defendant acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false. *Lovgren*, 126 Ill. 2d at 419-23.

■ In cases where both defamation and false light invasion of privacy claims might exist, the plaintiff may proceed under either theory, or both, but only one recovery for each instance of publicity is possible. *Dubinsky*, 303 Ill. App. 3d at 330. The claim of false light invasion of privacy protects one's interest in being let alone from false publicity. Our supreme court has adopted section 652E of the Restatement (Second) of Torts, stating, " '[o]ur study of the Restatement approach and Prosser's commentary on false-light privacy reveals that the heart of this tort lies in the publicity, rather than in the invasion into the plaintiff's physical solitude or affairs upon which the tort of invasion into seclusion is based.' " *Dubinsky*, 303 Ill. App. 3d at 331,

quoting *Lovgren*, 126 Ill. 2d at 418-19. In false light cases, a court need not distinguish between private and public figures, and a plaintiff's involvement in public matters does not automatically give the defendant the right to make or publish statements depicting the plaintiff in a false light. *Dubinsky*, 303 Ill. App. 3d at 331.

### a. *Statements regarding plaintiff's performance*

Plaintiff disputes the trial court's conclusion that he is a public figure for purposes of this litigation. However, the court's ruling on the issue is relevant only for determining whether defendant's allegedly defamatory statements are privileged. The existence of a privilege would require plaintiff to prove by clear and convincing evidence that defendant acted with "actual malice." In his reply brief, plaintiff makes the following concessions: "Plaintiff agrees that he must show actual malice on the defamation claim (Count I) to defeat any qualified privilege as to [defendant's] letters to the [school] officials. Plaintiff also agrees that he must show actual malice as an element of his false light claim (Count II)."

Furthermore, plaintiff acknowledged during a deposition that he thought defendant sincerely believed each of the allegedly defamatory statements. A judicial admission is a party's deliberate, clear, unequivocal statement about a concrete fact within the party's peculiar knowledge. It is well settled that the party making the admission is bound by that admission and cannot contradict it. *Eidson v. Audrey's CTL, Inc.*, 251 Ill. App. 3d 193, 195-96 (1993). Although plaintiff's own pleadings and testimony tend to undermine his argument that defendant knew that the derogatory statements were false or made in reckless disregard as to their truth or falsity (see *Gist*, 284 Ill. App. 3d at 374), we conclude that plaintiff has not conceded that he cannot prove the malice element of defamation and false light invasion of privacy.

Plaintiff agrees that he must prove that defendant acted with actual malice in making the statements to the school officials. Therefore, his argument that he is not a public figure is rendered moot for the purposes of his defamation claim regarding those statements. In his reply brief, plaintiff alleges that defendant also communicated defamatory statements to the press, and that he need not prove that defendant acted with actual malice in making those statements because plaintiff is not a public figure. Plaintiff cites no authority for the proposition that the requirement of proof of actual malice depends on the recipient of the allegedly defamatory communication. Plaintiff does not explain why he need not prove actual malice regarding some of the allegedly defamatory statements and not others. See

210 Ill. 2d R. 341(e)(7) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"). Furthermore, we are aware of no authority that permits two different standards of proof to apply to a single count. See 735 ILCS 5/2—613(a) (West 2002) ("each [cause of action] shall be separately designated and numbered"). In light of the concessions in plaintiff's reply brief, we conclude that the single defamation count, as alleged, requires plaintiff to prove that defendant acted with actual malice when he made the statements to both the school officials and the press. Our disposition does not preclude plaintiff from seeking leave to amend his complaint to divide his defamation allegations into two counts. 735 ILCS 5/2—616 (West 2002). If plaintiff chooses to amend his complaint, the trial court may consider whether defendant's communications to the press were privileged and whether he abused that privilege.

Plaintiff also alleges for the first time on appeal that defendant defamed plaintiff to the football parents. We conclude that plaintiff's new claim that defendant communicated defamatory statements to the parents is waived because the claim is not included in the complaint. See *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996) (issues not raised in the trial court are waived and may not be raised for the first time on appeal). If plaintiff is to prevail on the defamation and false light counts as currently alleged, he must prove by clear and convincing evidence that defendant acted with actual malice. See *Martin*, 244 Ill. App. 3d at 962 (defamation); see also *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1140 (7th Cir. 1985) (false light invasion of privacy).

The record contains evidence that defendant praised plaintiff's character and coaching ability at least twice from the fall of 1997 to the spring of 1998. A short time after his son began competing with plaintiff's son for the team's quarterback position, defendant submitted the letters to Lamberson and Bruder harshly criticizing plaintiff's performance and referring to him as a "joke" and "buffoon." The curious timing of defendant's conduct suggests that a question of fact exists as to whether defendant acted knowingly or recklessly when he lobbied the two administrators to discharge plaintiff as coach.

Defendant next contends that summary judgment was nevertheless appropriate because his communications to Lamberson and Bruder qualify as a petition to a governmental body and, therefore, his statements are immunized under the *Noerr-Pennington* doctrine. See *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961); *United Mine Workers of*

*America v. Pennington*, 381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965). Plaintiff responds that defendant's novel argument is a "classic red herring."

◼ The *Noerr-Pennington* doctrine stems from a Supreme Court opinion holding that parties who petition the government for governmental action favorable to themselves cannot be sued under the Sherman Anti-Trust Act, even though their actions are motivated by anticompetitive intent. *United Mine Workers of America v. Pennington*, 381 U.S. 657, 670, 14 L. Ed. 2d 626, 636, 85 S. Ct. 1585, 1593 (1965). There is a notable amount of case law addressing the question whether the *Noerr-Pennington* doctrine brings first amendment principles to bear on state-law tort claims. See, *e.g.*, *South Dakota v. Kansas City Southern Industries, Inc.*, 880 F.2d 40, 50-51 (8th Cir. 1989) (applying first amendment analysis to a state claim for tortious interference with contractual relations), *cert. denied*, 493 U.S. 1023, 107 L. Ed. 2d 745, 110 S. Ct. 726 (1990); *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155, 159-60 (3d Cir. 1988) (applying defamation and *Noerr-Pennington* analyses to tort claim based on the defendants' actions in alerting authorities to plaintiff's violations of law); *Havoco of America, Ltd. v. Hollobow*, 702 F.2d 643, 649 (7th Cir. 1983) (applying *Noerr-Pennington* and its "sham litigation" exception "to protect the First Amendment right to petition against claims of tortious interference with business relationships"); *Sierra Club v. Butz*, 349 F. Supp. 934, 938-39 (N.D. Cal. 1972) (applying first amendment analyses of *Noerr-Pennington* and defamation cases to state counterclaim for interference with advantageous relationship); *Florida Fern Growers Ass'n v. Concerned Citizens*, 616 So. 2d 562, 569 (Fla. App. 1993) (declining to follow *Sierra Club v. Butz*). However, we are unaware of any Illinois case that has analyzed the *Noerr-Pennington* doctrine in the context of claims for defamation and false light invasion of privacy under state law.

In *Westfield Partners, Ltd. v. Hogan*, 740 F. Supp. 523 (N.D. Ill. 1990), a land developer filed a suit for a deprivation of civil rights (42 U.S.C. § 1983 (1994)) against homeowners who had petitioned to prevent the development of a proposed roadway to acreage that the developer wanted to turn into "Tall Oaks Estates." The court held that the defendants' petitioning was absolutely privileged under the first amendment and based this privilege on the *Noerr-Pennington* doctrine. *Westfield Partners*, 740 F. Supp. at 525. The court noted that the defendants were sued for nothing more than exercising their right to petition their government.

◼ This case is distinguishable. Counts I and II of the amended complaint are not directed toward defendant's attempt to influence

governmental decision making. Instead, plaintiff takes issue with alleged defamation and false light invasion of privacy that occurred during that petitioning. We conclude that the rule announced in *McDonald v. Smith*, 472 U.S. 479, 86 L. Ed. 2d 384, 105 S. Ct. 2787 (1985), is more instructive than the *Noerr-Pennington* doctrine. The defendant in *McDonald* sent defamatory letters to various governmental officials, including President Reagan and Representatives Jack Kemp and Barry Goldwater, Jr., concerning the plaintiff's ethical qualifications to serve as United States Attorney, a position for which he sought appointment. The plaintiff sued for common-law defamation in state court, and the case was removed to federal court based on diversity of citizenship. The defendant moved for judgment on the pleadings, arguing that the petition clause of the first amendment, which guarantees "the right of the people *** to petition the Government for a redress of grievances" (U.S. Const., amend. I), provided him with absolute immunity to make the defamatory statements. The Supreme Court disagreed, noting that "[u]nder state common law, damages may be recovered only if [the defendant] is shown to have acted with malice." *McDonald*, 472 U.S. at 485, 86 L. Ed. 2d at 390, 105 S. Ct. at 2791. The Court held that "the Petition Clause does not require the State to expand [the first amendment] privilege into an absolute one. The right to petition is guaranteed; the right to commit libel with impunity is not." *McDonald*, 472 U.S. at 485, 86 L. Ed. 2d at 390, 105 S. Ct. at 2791. The Court declined to "elevate the Petition Clause to special First Amendment status." *McDonald*, 472 U.S. at 485, 86 L. Ed. 2d at 390, 105 S. Ct. at 2791.

The Court has elsewhere suggested that the *Noerr-Pennington* doctrine stems from the petition clause of the first amendment. See *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 378, 113 L. Ed. 2d 382, 396-97, 111 S. Ct. 1344, 1353 (1991); see also *LoBiondo v. Schwartz*, 323 N.J. Super. 391, 414, 733 A.2d 516, 529 (1999) ("the right to petition government for redress of grievances exists entirely independently of *Noerr-Pennington*, and indeed, the *Noerr-Pennington* doctrine itself seems to derive from that fundamental right"). Therefore, we conclude that the *Noerr-Pennington* doctrine does not provide defendant with protection that would supplement a privilege that is not already conferred by the petition clause.

Defendant argues that he is entitled to absolute immunity under the *Noerr-Pennington* doctrine, which itself rests on the petition clause. We reject defendant's argument because the Supreme Court clearly stated in *McDonald* that the petition clause does not bar a defamation claim as long as the plaintiff proves that the defendant acted with actual malice. Because counts I and II are related in that

each requires a showing of actual malice, we similarly rely upon *Mc-Donald* in rejecting defendant's *Noerr-Pennington* defense to the false light invasion of privacy claim.

We conclude that, because a question of fact exists as to whether defendant acted with actual malice or a reckless disregard of plaintiff's rights, the trial court incorrectly granted defendant summary judgment on plaintiff's claims for defamation (see *Gist*, 284 Ill. App. 3d at 374) and false light invasion of privacy (see *Lovgren*, 126 Ill. 2d at 419-23) based on the statements to Lamberson, Bruder, and the press regarding plaintiff's performance in the role of football coach. On remand, the trial court should apply the clear-and-convincing-evidence standard to this factual question, unless plaintiff chooses to amend the complaint to allege a separate count of defamation for each statement recipient, in which case the result could be different.

### b. *Statements regarding plaintiff's reputation among the football parents*

█ Plaintiff alternatively claims defamation based on defendant's statements to Lamberson and Bruder that many parents supported his campaign to remove plaintiff as football coach. The statements are defamatory *per se* because they tend to harm plaintiff's reputation by imputing widespread disapproval among the parents of the children he coached. In Illinois, an allegedly defamatory statement is not actionable if it is substantially true, even though it is not technically accurate in every detail. *Gist*, 284 Ill. App. 3d at 371. While this rule is rooted in the United States Constitution, it is also logically driven, as " 'falsehoods which do no *incremental* damage to the plaintiff's reputation do not injure the only interest that the law of defamation protects.' " (Emphasis in original.) *Gist*, 284 Ill. App. 3d at 371, quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993).

A defendant bears the burden of establishing the "substantial truth" of his assertions, which he can demonstrate by showing that the "gist" or "sting" of the defamatory material is true. *Gist*, 284 Ill. App. 3d at 371. When determining the "gist" or "sting" of allegedly defamatory material, a trial court must " 'look at the highlight of the article, the pertinent angle of it, and not to items of secondary importance which are inoffensive details, immaterial to the truth of the defamatory statement.' " *Gist*, 284 Ill. App. 3d at 371, quoting *Vachet v. Central Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir. 1987). While substantial truth is normally a question for the jury, where no reasonable jury could find that substantial truth had not been established, the question is properly one of law, which this court may review *de novo*. *Gist*, 284 Ill. App. 3d at 371.

■ Defendant's November 8, 2000, letter to Lamberson listed the names of 105 football parents and 36 players who purportedly signed the petition. Apparently in the interest of candor, defendant also included the names of several other football parents who declined to sign the petition. During discovery, defendant produced the signatures of only 29 parents and 23 players who actually supported the petition, but defendant's motion for summary judgment included supporting statements from 42 parents. Attached to plaintiff's amended complaint were affidavits in which six parents testified that defendant falsely reported to Lamberson that they had signed. Although we do not condone defendant's misrepresentation, we conclude that he established the gist of his assertion that many parents did not approve of plaintiff's performance as coach. Because no reasonable jury could find by clear and convincing evidence that defendant had not established the substantial truth of that particular statement, we conclude that the trial court properly resolved the question on defendant's motion for summary judgment. See *Gist*, 284 Ill. App. 3d at 371; see also *Martin*, 244 Ill. App. 3d at 962.

The dissent contends that the positive denials of a few parents support plaintiff's claims of defamation and false light invasion of privacy. We respectfully disagree. Although the six parents' affidavits verify plaintiff's assertion that defendant exaggerated the level of discontent among all of the parents, they do not establish " '*incremental* damage to the plaintiff's reputation.' " (Emphasis in original.) *Gist*, 284 Ill. App. 3d at 371, quoting *Haynes*, 8 F.3d at 1228. If we were to adopt the dissent's view, we would effectively eliminate the defense of *substantial* truth in defamation and false light cases; only *absolute* truth would bar such claims. See *Gist*, 284 Ill. App. 3d at 371.

## 2. Interference with Prospective Economic Advantage

■ Finally, we consider plaintiff's argument that he is entitled to a trial to determine whether defendant improperly interfered with plaintiff's employment as football coach. " 'To state a cause of action for intentional interference with prospective economic advantage, a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff *resulting from the defendant's interference*.' " (Emphasis added.) *Voyles v. Sandia Mortgage Corp.*, 196 Ill. 2d 288, 300-01 (2001), quoting *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 406-07 (1996).

Plaintiff argues that the causation element is an unresolved ques-

tion of fact precluding the entry of summary judgment. Plaintiff cites Bruder's testimony that defendant told her that he would work toward her removal as the athletic director if she did not terminate plaintiff's employment as the football coach. However, both Bruder and Lamberson testified that defendant's conduct did not affect the decision to remove plaintiff as the coach. Plaintiff's assertion as to the importance of defendant's threat to Bruder is speculative and contrary to the unequivocal and uncontroverted testimony of Bruder and Lamberson.

The dissent asserts that "it is error for the majority to presuppose that even uncontroverted testimony from Bruder and Lamberson would not raise a material question of fact, because it is the fact finder's province to assess the credibility of Bruder and Lamberson." 348 Ill. App. 3d at 924 n.1. This statement runs contrary to the well-settled rule that a party opposing a motion for summary judgment may not rely upon his pleadings alone to raise an issue of material fact to rebut uncontradicted facts introduced by the moving party. *Hermes*, 226 Ill. App. 3d at 824. Plaintiff has offered no evidence to impeach Bruder and Lamberson, and we decline to speculate, as the dissent does, that the timing of their decision and their awareness of defendant's efforts render their unequivocal testimony incredible. Plaintiff's claim fails because he offers no evidence to establish that defendant's conduct induced or caused a breach or termination of plaintiff's employment as the school's head football coach. Therefore, the trial court correctly granted defendant summary judgment on the claim of interference with prospective economic advantage.

We reverse the entry of summary judgment on the defamation and false light invasion of privacy claims, affirm the entry of summary judgment on the claim of interference with prospective economic advantage, and remand the cause for proceedings that are consistent with this opinion.

Affirmed in part and reversed in part; cause remanded.

McLAREN, J., concurs.

PRESIDING JUSTICE O'MALLEY, specially concurring in part and dissenting in part:

I dissent on two grounds. First, the defamation and false light counts should be reinstated, not just as to defendant's statements concerning plaintiff's competence as a coach, but also as to defendant's statements concerning plaintiff's reputation among the parents of football players. Contrary to the majority, I believe that a reasonable jury could find that defendant did not prove the substantial truth of the latter statements.

The majority reduces the issue of substantial truth to the question of whether one number forms a substantial part of another number. For the majority, the question is simply whether a jury reasonably could find that defendant's allegation that 105 football parents and 36 football players signed the petition for removal was substantially proven with evidence that only 42 parents and 23 players signed the petition. Given the disparity between these numbers, I cannot see how a court can presume that no reasonable jury could find that defendant's assertion was not substantially proven. Yet, in my view, this is not the real question before us. The majority has diluted plaintiff's allegations of false light invasion of privacy (hereinafter false light) and defamation. Plaintiff's claims for defamation and false light do not rest entirely on defendant's failure to produce the signatures he claimed to have obtained. Plaintiff might have asked us simply to infer that the signatures defendant failed to produce never existed, but he does more than that. He attaches to his complaint statements from 6 of the 150 alleged signatories in which they positively deny that they signed the petition. In my view, plaintiff's claim that defendant falsely asserted that these six individuals signed the petition itself constitutes a claim for false light and defamation. Therefore, the majority could not rightfully uphold the dismissal of plaintiff's complaint unless no reasonable jury could find that defendant failed to establish the gist of his claim that these individuals signed the petition. The majority does not undertake this analysis, however, but instead diverts attention from the substance of plaintiff's allegations. What plaintiff has alleged is not simply defendant's failure to substantiate his claim to have X number of signatures, but also defendant's outright falsehood that he had obtained the signatures of the six individuals. Symptomatic of the majority's erroneous approach is how it concludes its analysis: "[W]e conclude that [defendant] established the gist of his assertion that many parents did not approve of plaintiff's performance as coach." 348 Ill. App. 3d at 921. This is an inappropriate broadening of defendant's remarks. The basis of plaintiff's lawsuit is not that defendant asserted vaguely that "many parents did not approve of plaintiff's performance as coach," but that defendant falsely identified specific individuals as signatories of the petition and, therefore, as having the opinion that plaintiff was a poor coach. The question is whether a jury reasonably could find that defendant established the gist of his assertion that identifies specific individuals as signatories. This is a fact question that precludes summary judgment.

The majority suggests that my position "would effectively eliminate the defense of substantial truth." (Emphasis omitted.) 348 Ill. App. 3d at 921. Far from it. I accept the defense of substantial

truth. What I insist on is that our court properly recognize the allegedly defamatory remarks whose truth is at issue. Plaintiff takes issue with, *inter alia*, defendant's assertion that six specific individuals named in the petition actually signed it. That assertion is itself defamatory and places plaintiff in a false light. Plaintiff controverted the assertion with attachments to his complaint. The issue, therefore, is whether defendant can show the substantial truth of that particular, definite assertion, not of the vague assertion that many parents did not care for plaintiff's coaching. Contrary to what the majority claims, plaintiff does not recite anything approaching the latter assertion in his complaint, and to devote attention to this illusory assertion, as does the majority, diverts attention from the substance of this lawsuit.

I dissent also from the affirmance of the trial court's summary judgment on count III, which alleges tortious interference with prospective economic advantage. While I agree with the majority that "Bruder and Lamberson testified that defendant's conduct did not affect the decision to remove plaintiff as the coach," I do not agree that their testimony was "unequivocal and uncontroverted." 348 Ill. App. 3d at 922.[1]

Bruder and Lamberson both testified that the decision not to retain plaintiff as head football coach was due entirely to a new bylaw of the Illinois High School Association that allows coaches of teams in sports programs that do not have summer seasons to have a maximum of 25 summer training days with each team. Bruder and Lamberson both testified that plaintiff's contract to coach football was not renewed solely because they believed he would be unable to comply with the bylaw and still effectively coach both baseball and football.

While Bruder and Lamberson both were challenged extensively in their depositions on this claim, I will focus primarily on Bruder's description of her rationale for not recommending that plaintiff be retained as football coach, because Lamberson testified that he deferred to Bruder's judgment on that point. Bruder testified that defendant began pressing for plaintiff's termination as football coach in January 2000 and continued his efforts throughout the following

---

[1]While I disagree with this description, I would find summary judgment inappropriate even if Bruder's and Lamberson's testimony was flawless. Plaintiff has alleged that Bruder's and Lamberson's deliberations over whether to retain plaintiff as football coach under the bylaws occurred simultaneously with defendant's defamatory campaign to remove plaintiff as incompetent. Given this context, it is error for the majority to presuppose that even uncontroverted testimony from Bruder and Lamberson would not raise a material question of fact, because it is the fact finder's province to assess the credibility of Bruder and Lamberson.

summer and fall. She also testified that, although the bylaw came into effect in June 2000, she did not decide to release plaintiff as football coach until January 2001. She further testified that, in October 2000, defendant told Bruder that if plaintiff was not fired as football coach, "they" would have Bruder fired. To impeach her on these points, plaintiff's counsel showed Bruder an e-mail from defendant to one Joanne Mullen, dated October 29, 2000, in which defendant reported that Bruder had decided not to retain plaintiff as football coach. Defendant wrote, however, that he still wanted to send Bruder a petition to "provide overwhelming parental support" for plaintiff's termination rather than some "wimpy" alternative remedy. Bruder agreed that the e-mail was sent after defendant had threatened her, but she denied that she had already made her decision to fire plaintiff when the e-mail was sent. I do not see how Bruder's testimony can be described as "uncontroverted" given this impeachment of her claim that she did not accede to defendant's demands.

Bruder's claim as to why plaintiff was fired was controverted in other ways as well. She testified that, when she admonished plaintiff in October 2000 that the bylaw might have the effect of barring him from coaching both football and baseball, in which case he would be forced to choose between the two, he responded that he did not wish to give up a sport, but, if forced to choose, would select baseball. Bruder testified that, throughout November and December, plaintiff continued to protest the prospect of having to select a sport and reiterated that he would select baseball if forced to choose. Bruder testified, however, that when she decided in January 2001 that plaintiff could not coach both baseball and football, she "unilaterally" decided to remove him from football, not baseball:

"Q. Before you made the final decision in January 2001, okay, did you consult with—did you ask [plaintiff] at that time, the decision has been—did you tell him, lookit [sic], we—we've made the decision, you can only have one? Did you say it to him that way or did you just tell him you are no longer the head football coach?

A. I—to the best of my recollection, I believe I said that I'd already made the decision.

Q. That you had already made the decision?

A. Yes.

Q. Okay. But the decision you're talking about to us today is the decision that—that he could not hold both varsity positions, correct?

A. Correct.

Q. Okay. My question to you is—

A. Mm-hmm.

Q. —in January of 2001 when you said you made [sic] decision that he could not hold both positions—

A. Mm-hmm.

Q. —did you offer him to now choose between either football or baseball in January 2001?

A. No, I did not.

Q. So at that time you unilaterally made the decision that you would—or you make a recommendation, I take [sic]—Dr. Lamberson makes the ultimate decision, according to your testimony—that it was your decision that he longer be the head varsity football coach, correct?

A. That is correct.

Q. So as you sit here today, you don't know what decision he would have made in January of 2001 had you offered him one or the other, correct?

A. I don't know what—that it [sic] would be correct, um-hum."

Thus, although plaintiff had remarked previously that he would select baseball if forced to choose between sports, Bruder did not rely on those remarks or obtain new input from plaintiff in recommending that plaintiff be removed as football coach. Why did she choose baseball for plaintiff without obtaining his input? She could not have been relying entirely on the bylaws, for they did not determine which sport of the two plaintiff should coach. Although Bruder never explicitly stated her reasons for choosing baseball for plaintiff, the following exchange is revealing:

"Q. *** And after considering the issues on the side voiced by [defendant], you eventually made the decision to remove [plaintiff], correct?

A. Wasn't the only part of the decision that—

Q. I know—

A. —was made—

Q. It wasn't the only part, but those issues were considered, correct?

A. Yes.

* * *

Q. *** [I]n January of 2001, you never asked [plaintiff], which job do you want? Do you want to—in January before you made the final decision, you didn't ask him, which job do you want, to be the head varsity football coach or the head varsity baseball coach, correct?

A. That is correct.

Q. You said—that is correct. And in January of 2001, after this campaign by [defendant], and after all of the issues that you considered, voiced by [defendant] as the number one antagonist, you chose not to offer [plaintiff], in January of the year 2001, to remain as head varsity football coach. You said at that time that he

was no longer gonna be renewed as the head varsity football coach. Correct?

A. Correct.

Q. Thank you, when you said earlier that a parent can voice concerns, and you take into consideration what a parent may say about the athletic programs that—athletic high school—you take into consideration, as you did in the issues in this case, correct?

A. Correct.

Q. Okay. And that's because you are responsive as a community leader or community—what did we suggest you were earlier—a community professional exercising professional judgment—it's okay for you to take into consideration their opinion—their—not only their opinions but there [sic]—their opinions, correct?

A. It's part of my job, yes."

Bruder acknowledged not only the obvious fact that, as the athletic director of a public high school, she considers the opinions of community members in making her decisions regarding the school's athletic programs; she also acknowledged that she considered defendant's opinion of plaintiff in reaching her decision not to retain plaintiff as football coach. A jury reasonably could find, in light of these admissions, that defendant's campaign against plaintiff influenced Bruder's decision not to retain plaintiff as football coach and that her conclusory denial that defendant influenced her was self-serving and incredible. The majority recounts none of the flaws in Bruder's account but simply notes that Bruder testified that "plaintiff was removed because summertime scheduling conflicts precluded him from serving as the head coach of both the football and baseball teams." 348 Ill. App. 3d at 912.

Lamberson's testimony also is telling. Lamberson testified that he had several meetings with Bruder in the fall of 2000. The topic was the growing disapproval among football parents of plaintiff's coaching. Plaintiff was present at the first and last of these meetings. At the first meeting, which occurred near the end of the football season, plaintiff remarked that he was the subject of a "witch hunt" and asked whether he would be removed as football coach. Lamberson deferred to Bruder, who told plaintiff that the decision would not be made until well after the season had ended. At the next meeting, Lamberson and Bruder discussed the petition that she had recently received from defendant and other football parents. At the following meeting, Bruder told Lamberson that she "was coming to closure on the decision about whether [plaintiff] would be the head football coach for next year." Plaintiff was present at the next meeting. Before plaintiff entered the meeting room, Bruder told Lamberson that she

"felt very comfortable moving in the direction of not having [plaintiff] as head football coach so that he could dedicate full time opportunities for the baseball program." Bruder did not mention the possibility of retaining plaintiff for football rather than baseball. When plaintiff entered the room, Bruder told him she was "leaning in the direction of having him focus on baseball" but had not made a final decision. Afterwards, plaintiff told the press that he had been fired as football coach.

Lamberson's testimony was consistent with Bruder's in that both indicated that Bruder decided, independently of plaintiff, not only that plaintiff would no longer coach both football and baseball but that baseball, not football, would be the sport that plaintiff would continue to coach. Neither Lamberson nor Bruder clearly indicated what led Bruder to retain plaintiff for baseball instead of football. However, as noted above, certain aspects of Bruder's testimony suggest that she was influenced by defendant's lobbying. I believe there is enough ambiguity in the relevant testimony to raise a fact question for the jury as to whether defendant influenced Bruder's decision to remove plaintiff as football coach.

The majority claims that "[p]laintiff has offered no evidence to impeach Bruder and Lamberson." 348 Ill. App. 3d at 922. This is incorrect. Plaintiff offers ample evidence, citing relevant portions of the depositions to support his argument. It is the majority that provides no reason to believe that the evidence plaintiff cites does not impeach Bruder and Lamberson, as it clearly does. The majority also claims that I merely "speculate" that certain aspects of the decisional process leading to plaintiff's termination as football coach "render[ ] [Bruder's and Lamberson's] unequivocal testimony incredible." 348 Ill. App. 3d at 922. The majority makes no attempt to show in what way my analysis, based squarely on the deposition testimony cited by plaintiff, is mere speculation. At any rate, I have not concluded that Bruder's and Lamberson's testimony is incredible but, rather, that a reasonable jury could regard it as such. Because material facts are in dispute, I believe summary judgment is inappropriate.